256 F.2d 791
 Michael B. TENORE and Joseph Scaramuzzo, co-partners doing
business as Rico Sales Company, a partnership,
Plaintiffs-Appellees,
v.
AMERICAN AND FOREIGN INSURANCE COMPANY OF NEW YORK et al.,
Defendants-Appellants.
 No. 12179.
 United States Court of Appeals Seventh Circuit.
 June 19, 1958, Rehearing Denied July 29, 1958.
 
 John P. Gorman, Chicago, Ill. (Donald N. Clausen, Herbert, W. Hirsh, Chicago, Ill., on the brief), for defendants-appellants.
 Anna R. Lavin, Chicago, Ill. (Kenneth S. Nathan, Melvin L. Klafter, Chicago, Ill., on the brief), for plaintiffs-appellees.
 Before DUFFY, Chief Judge, and SCHNACKENBERG and HASTINGS, Circuit judges.
 DUFFY, Chief Judge.
 
 
 1
 Plaintiffs bring this action on eight policies of fire insurance covering contents of a mail order gunshop located on West Division Street, Chicago, Illinois. The total amount of the policies was $80,000.00. A fire occurred on October 10, 1951. The proofs of loss submitted by plaintiffs were for $78,698.34. The case was tried to the Court. A judgment was entered in favor of plaintiffs in amounts aggregating $20,000.00.
 
 
 2
 In late July, 1951, plaintiffs entered into an equal partnership agreement to engage in 'the business of buying, selling, trading of Guns, Gun parts, Surplus goods, Military goods, etc.', under the name of Rico Sales, company. Plaintiff Scaramuzzo had been engaged in the gunsmith business for some thirty years. In 1947 he set up a separate mail order business which he operated under the firm name of Rico Sales Company. He continued in the mail order business until late 1949 or early 1950. The partnership hereinbefore described was to reactivate and carry on under the old name of Rico Sales Company but from a new address, 5737 West Division Street, Chicago.
 
 
 3
 About the time of the removal of the stock to the new location, plaintiff Tenore arranged through a broker, to insure the personal property of the partnership for $80,000.00, and the policies of insurance were duly issued. One insurance company desired an inspection of the property and contents, and arranged for an appointment at the premies on October 10, 1951 at 10 a.m. When the parties arrived at the scheduled hour on October 10th, they discovered that during the night a serious fire, accompanied by explosions, had seriously damaged plaintiffs' property. The nature of the fire aroused suspicion and the origin of the fire was investigated, but the Chicago Fire Department listed the cause as 'undetermined.'
 
 
 4
 After the fire the windows and doors of the building were open, and the contents largely unprotected. By agreement of the parties concerned, the guns, gun parts and related merchandise were removed to a designated warehouse. The merchandise was sorted and placed on tables and the two plaintiffs made an inventory. The actual pricing or valuing of the merchandise was done later by Scaramuzzo, and he placed a value thereon of $78,698.34. This sum was incorporated into the sworn proofs of loss. The companies refused to pay, their principal defense being that the policies sued upon became and were rendered void because of the wilful and false swearing of the plaintiffs with respect to the value and loss of the property insured. Each of the policies here involved provided 'The entire policy shall be void if, whether before or after a loss, the insured has willfully concealed or misrepresented any material facts or circumstances concerning this insurance or the subject thereof, * * * or in case of any fraud or false swearing by the insured relating thereto.'The inventory was divided into 532 items or lots. The first 161 lots were made up of one gun each. All of these guns had been used. Forty-five were listed as riot shotguns which although of .12 gauge had barrels of only tewenty inches in length. A number of the guns were sawed-off shotguns, the sawing having been done on a crude manner. A number of the guns had cracked stocks, some of which had been wrapped with wire, others had no stocks at all. Still others were unusable because of missing parts. Sixty-six of the guns were Winchesters and ten were of the Ithaca make. Fifteen of the lots were parts for Thompson Machine guns.
 
 
 5
 The first sixty-five lots had been shipped out from the Winchester factory during the years from 1893 to 1912 except for one shipped in 1913 and two in 1917. The value which Scaramuzzo placed on these guns was $60.60 each, which was the catalog wholesale price for a new gun. His total for these guns was $3,939.00. A sales expert from the Winchester factory explained these guns were not collector's items as more than a million had been manufactured and sold. His total valuation for the sixty-five guns was $667.50.
 
 
 6
 The twelve Ithaca guns had been shipped to Wells Fargo Express Company between 1909 and 1917. They were listed as riot guns and had twenty-four inch barrels. Scaramuzzo valued these guns at $60.00 each, irrespective of previous condition. The sales manager for Ithaca Gun Company described the Ithaca guns as follows: 'All these guns were in very, very bad condition. They were all guns made prior to the general use of smokeless powder. * * *' For some reason the trial court struck out the testimony of this witness to the effect that it would be dangerous to use present-day heavy loads in these guns. The Ithaca expert valued these guns at from $5 to $7.50 each.
 
 
 7
 The trial court disregarded the testimony of the foregoing witnesses and stated that he chose to take the valuation of witnesses Lovell and Amber. Lovell is employed in the post office at Elmhurst Illinois. He testified his 'business on the side is gun parts.' At one time he was an officer of the Illinois State Rifle Association. Lovell valued the entire inventory at $15,727.19. The witness Amber who is editor of the 'Gun Digest' is also a gun collector. His valuation was from $13,290.25 to $15,796.73. The District Court said that he was adding something to the figures given by witnesses Lovell and Amber and came up with the final valuation of $18,940 for the stock in trade and $1060 for furniture and fixtures, or a total valuation of $20,000.00. This figure is $58,698.34 less than the valuation as sworn to by the plaintiffs.
 
 
 8
 Ordinarily the question of fraud is a question of fact to be determined by a jury or by the trial court if sitting without a jury. However, as said by Cooley in his Briefs on Insurance, Second Edition, page 5864: '* * * there is a point where the question of fraud or false swearing becomes one of law, and beyond which the insured cannot be heard to say that his intent was innocent.' We must, of course, take the evidence most favorable to the plaintiffs, but we are not required to consider the obviously false testimony of Scaramuzzo. Although many of the guns were in the junk class with missing parts, cracked stocks, sawed-off barrels, and practically all were more than fifty years old, Scaramuzzo swore in his testimony and in the proofs of loss that they were each worth $60.60, the catalog wholesale value of a new gun. This was intentional false swearing as a matter of law. Even the trial court characterized Scaramuzzo's valuation as 'fantastic' (Appendix 634).
 
 
 9
 It, apparently, was the theory of the trial court that as plaintiff sustained a substantial loss by reason of the fire, and as defendants did not pay out any money and thus were not deceived by plaintiffs' claims, the actual loss sustained should be paid by the insurance companies. This approach ignores the fact that this is an action based on eight contracts. Each contract provided the policy shall be void if the insured wilfully misrepresented a material fact or in case of false swearing by the insured with reference to a material fact.
 
 
 10
 Statements in an opinion by the Fifth Circuit in Chaachou v. American Central Insurance Company, 5 Cir., 241 F.2d 889, 892, 893, are in point: 'The contract does not spell out that it is only false swearing, misrepresentation, concealment or fraud which is successful that avoids the policy. * * * A judge-made policy which thus gives advantage to dishonesty will retard, not accelerate, the orderly adjustment of insurance losses.'
 
 
 11
 The deliberate exaggeration of values made by Scaramuzzo is equally binding upon plaintiff Tenore for it is clear from the evidence that the latter entrusted to his partner, Scaramuzzo, the duty of making such valuation, and he joined in the proof of loss.
 
 
 12
 Had Scaramuzzo valued five, ten or possibly twenty guns at an excessive price, and had displayed some effort to make an honest valuation as to the other guns, although we might disagree, we would feel bound by the decision on valuation made by the trier of the facts. But here, plaintiffs gave a new-gun valuation to every one of the sixty-six Winchesters and the ten Ithacas. Ignoring the fact that practically every one of these guns had been munufactured and shipped more than fifty years ago, many of them were in the 'junk' class with split stocks, sawed-off barrels and parts missing. We are not aware of any legitimate use for saweed-off shotguns, but we feel quite certain that hacking off a part of the barrel does not give such a gun the valuation of a similar type gun which never had been used.
 
 
 13
 In American Home Fire Assurance Co., v. Juneau Store Company, 7 Cir., 78 F.2d 1001, this Court considered a case where the insured made a proof of loss in the sum of $73,000.00 under policies of insurance totaling the sum of $56,000.00. The jury returned a verdict of $33,000.00, and judgment was entered for the plaintiffs upon this verdict. Upon appeal, this Court reversed the trial court and said, pages 1002-1003: 'We would have no difficulty accepting the views expressed in Wiesman v. American Insurance Company, 184 Wis. 523, 199 N.W. 55, 200 N.W. 304, if the record before us showed any possible basis for the discrepancy in values through difference of opinion as to value. * * * On the other hand, responsibility cannot, or at least should not be avoided, because of a desire to see an insured who has suffered a loss collect his insurance. The applicable principle of law is clear. * * * Under the Wisconsin Standard Fire Insurance Policy, the insured, if he suffers a loss, must honestly state, under oath, the extent of his loss and give this information to the insurer. He must not make false proofs of loss with intent to defraud the insurer. Although the penalty is heavy and seemingly harsh, it is one way of stopping the presentation of false, fictitious or inflated claims. False and exaggerated claims seemingly to hand in hand with incendiarism. The court should therefore unhesitatingly act to prevent attempted frauds on the part of the insured.'
 
 
 14
 Although the Juneau Store Company case was decided in 1935, the language is quite similar to the late decision of the Court of Appeals of the Fifth Circuit in Chaachou v. American Central Insurance Company, supra.
 
 
 15
 True, this Court was applying Wisconsin law in the Juneau Store Company case, but the provisions in the policies there in issue were similar in substance to those contained in the eight policies which are sued upon in the case at bar.
 
 
 16
 We think that the rule in Illinois is in accord with the principles hereinbefore stated. Butler v. Security Insurance Company of New Haven, Conn., 244 Ill.App. 379; Kavooras v. Insurance Company of Illinois, 167 Ill.App. 220, and Ledford v. Hartford Fire Insurance Co., 161 Ill.App. 233.
 
 
 17
 The general statement of the rule appears in 29 American Jurisprudence, 1132: 'Policies of fire and property indemnity insurance usually provide that any fraud or false swearing on the part of the insured, whether before or after loss, shall relieve the insurer from liability. Under such a provision, false statements as to material matters wilfully made by the insured in proofs of loss with the intention of thereby deceiving the insurer will preclude any recovery on the policy by the insured; * * * If a false statement is knowingly made by the insured with regard to a material matter, the intent to defraud will be inferred, the law presuming every man to intend the natural consequences of his acts. * * *'
 
 
 18
 We hold that the plaintiffs in the case at bar knowingly and wilfully made false statements with regard to a material matter with an intent to defraud. By reason thereof the plaintiffs are not entitled to recover any sum under their policies. The judgment for the plaintiffs is
 
 
 19
 Reversed.