**Wayne A. EASTMAN, Jr.,
Plaintiff–Appellant,**

v.

**CHICAGO, CENTRAL & PACIFIC
RAILROAD COMPANY (CC &
P), Defendant–Appellee.**

No. 90–1058.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 6, 1990.

Decided April 19, 1991.

Carlton E. Odim, Chicago, Ill., for plaintiff-appellant.

James A. Fletcher, David B. Potter, Lois K. Winston, Oppenheimer, Wolff & Donnelly, Chicago, Ill., for defendant-appellee.

Before BAUER, Chief Judge, FLAUM, Circuit Judge, and ESCHBACH, Senior Circuit Judge.

BAUER, Chief Judge.

The issue in this appeal is whether the Chicago, Central & Pacific Railroad Company ("CC & P") made, and then breached, an oral contract for permanent employment with Wayne Eastman. The jury thought so, and awarded Eastman damages for wrongful discharge. But the district court judge disagreed. In fact, the court believed that no verdict in Eastman's favor could ever stand and, accordingly, granted CC & P's motion for judgment notwithstanding the verdict ("JNOV"). For the reasons discussed below, we affirm.

I

Wayne Eastman was a railroad man. Beginning in January 1969, he worked eighteen years for the Illinois Central Gulf Railroad ("ICG"). By early 1986, Eastman had advanced to the management position of "trainmaster" with the ICG. Eastman also had acquired substantial seniority in his union. As a result of the combination of that seniority and a merger protection agreement in effect at ICG, Eastman's position at ICG was "permanent," meaning that, should he lose his management position with ICG, he was guaranteed employment (at a substantially lower salary) within the union ranks.

In late 1985, ICG—which by that time had become "IC Industries," a diversified holding company—began selling off its lines to other railroads. Seeing the handwriting on the wall, Eastman started looking for jobs with likely purchasers of ICG's lines and other railroads in the Chicago region. (Eastman had worked for many years in ICG's Chicago yards and wanted to keep his family here.) A few months later, in February 1986, Eastman got a call from Terry Hearst, vice president of transportation at CC & P. CC & P, a new railroad company, had purchased some of ICG's lines west of Chicago, and some ICG employees had already gone over to CC & P after that sale. Hearst, himself a former ICG employee, was calling to see if Eastman, too, would be interested in coming over to CC & P. Hearst told Eastman that CC & P was "having a lot of problems" because many inexperienced people had been hired. To address these problems, Hearst was planning to create a new "superintendent" position and fill it with someone who had significant management experience in the rail industry. The superintendent basically would oversee the operations of CC & P's lines between Chicago and Galena. Hearst confided that Eastman's name was "on the top of the list" for that new position, and asked him if he was interested. Eastman assured Hearst that he was indeed interested, so they scheduled an interview to take place a few days later at CC & P's offices in Waterloo, Iowa.

What occurred at that interview in February 1986—the substance of the conversations between Eastman and Hearst, promises and statements that were and were not made, etc.—is the critical factual question upon which this case depends. Thus, we must focus in some detail on the record evidence concerning that meeting.

For his part, Eastman offered only his own recollections of the meeting. According to Eastman's testimony, he and Hearst spent a long afternoon together, during which they toured the Waterloo facilities and talked about the future of the fledgling CC & P and Eastman's potential role in it. Hearst was very positive, telling Eastman that CC & P was "all psyched up and raring to go." Hearst also told Eastman, according to Eastman's testimony, that the CC & P needed a superintendent who could "step in and take charge of the railroad." Eastman testified that he was concerned with leaving the ICG and losing the union security he had built up there, and that he shared that concern with Hearst. According to Eastman, Hearst told him that he, too, had worried a great deal about the stability and security he had sacrificed when he left the ICG. But Hearst assured Eastman, "This is the place to be." Still concerned, Eastman "flat out asked [Hearst], 'What is going to happen down the road?'"

Q [Plaintiff's counsel]: What did he say when you asked him that question?

A [Eastman]: He assured me that there would be a job down the road. He said, "I'm not sure right now whether you are going to end up as superintendent with the east half of the railroad ... or you are going to end up as area manager in Chicago." ... But he assured me I would have a job with the CC & P. It wasn't a bandaid approach: "Come in and fix my railroad and you're gone." ...

Q: ... [D]id he make any comment with regard to your giving up the union security?

A: Well, I told Mr. Hearst that they would have to match my security that I was giving up. I had security with

my union, ... and I told him I could not go over to the CC & P without assurances and guarantees that I would have a job. I wasn't going to give all this up to come over on a whim....

Q: What did he say in response to those concerns that you expressed?

A: He told me not to worry.... [O]nce the railroad was up and running and these beginning problems were over, I would either be superintendent or I'd be area manager. He told me I would have a job, and I was assured I would have a job.

Q: Did he tell you for how long you would have a job?

A: We didn't use exact words or references, but it was, you know, it was a forever type attitude.... You know, we talked long-term, we talked plans, we talked future, we talked security.

Q: Would you say he was matching your union security?

A: The security I was giving up, ... what I had [at ICG], he said I'd have it. He told me not to worry....

Transcript of Proceedings on July 26, 1989 ("Trial Tr."), Vol. 2, at 21–24.

On cross-examination, Eastman admitted that, at least going into the interview, he was concerned because "it was a newly created job" and he "did not know if it was going to be permanent." When pressed as to the exact words used by Hearst, Eastman could not recall whether the word "permanent" was ever used, nor could he swear that Hearst ever described the job as "guaranteed." To the question "Did he tell you you had the job for the rest of your life?", Eastman responded, "I don't believe he used that term." CC & P's counsel pressed Eastman further, which resulted in the following exchange:

Q [Defendant's Counsel]: But did he tell you that that job was going to be around for as long as you wanted it?

A [Eastman]: No, I can't say in that many words, you know, exactly what

words he said, but he told me I would have the job there as long as we wanted it, yes.

Trial Tr., Vol. 2, at 93–97. Finally, on cross-examination, Eastman explained that he never asked Hearst to put any of these assurances into writing because "it is not common practice in the rail industry," and Eastman admitted that he knew of no one else at either CC & P or ICG who had a guaranteed job. *Id.* at 97–101.

Hearst's account of the events and conversations was quite different. Hearst, who had left the employ of CC & P over one year before the trial on Eastman's claim, denied ever making the kind of assurances described by Eastman:

Q [Defendant's counsel]: At any time in your interview with Mr. Eastman that day, Mr. Hearst, did you tell him that he would have that superintendent's job for the rest of his life?

A [Hearst]: No.

Q: Did you ever tell him at any time during the interview that that job would be guaranteed, guaranteed for as long as he was willing to work at it?

A: Never.

Q: Now, when you offered the job to Mr. Eastman that day, did he tell you that he couldn't leave his position at the [ICG] ... unless you gave him a guarantee that he would have a job with the [CC & P] for as long as he wanted?

A: No, we never discussed guarantees.

Trial Tr., Vol. 1, at 37–38. *See also id.* at 41 (wherein Hearst testified that at no time either before or after Eastman was terminated by CC & P did he (Hearst) tell him the job was "guaranteed"). Hearst added that not a single management employee at the CC & P had a guaranteed job, and that he, in fact, was not authorized to offer such a job. *Id.* at 38–39.[1] Further, according to Hearst, the job security Eastman had at ICG and the "permanent" status of his job there were never discussed, neither in the telephone conversations between

---

1. Two other defense witnesses also testified that, in their extensive experience in the rail industry, they knew of no management employees whose positions were "guaranteed." *See* Trial Tr., Vol 1, at 51–52 (testimony of Paul Anderson, Eastman's friend and co-worker at both ICG and CC & P) & 75 (testimony of Henry Haney, Eastman's supervisor at ICG).

Eastman and Hearst nor at the interview in Waterloo. *Id.* at 27 & 31–32.

Both Eastman's and Hearst's accounts agree on this much: at the end of their afternoon together, Hearst offered Eastman the superintendent position and asked him to think about it. Eastman accepted the job on the spot. The salary was $45,000 per year, $2,000 to $3,000 per year higher than Eastman's salary as a trainmaster at ICG. CC & P also gave Eastman other perks he did not have at ICG, including the use of a brand new company car, the possibility of a performance-related bonus, and regular, daytime hours (Eastman's hours at ICG had been from 4:00 pm to 2:00 am).

The day after his interview in Waterloo, Eastman met with his boss at ICG and gave his two weeks' notice. Eastman then collected a $22,820 severance payment from ICG in return for, among other things, the release of his rights under ICG's merger protection agreement. His employment at ICG concluded, Eastman began working at CC & P in early March 1986. In Eastman's first few months at the superintendent position, all indications were that he was performing well. Eastman testified that both Hearst and Jack Haley, the president of CC & P, gave him positive reviews of his work. Then, in mid–1986, CC & P experienced further financial problems. Haley decided to reorganize the company, and, in August 1986, he sent out notices to all employees to that effect. Pursuant to that reorganization, Eastman was terminated on August 19, 1986, and his position was eliminated. (Eastman remained on the CC & P payroll for an additional month.) Soon thereafter, CC & P itself went into reorganization pursuant to a bankruptcy proceeding.

In July 1988, Eastman brought this suit for wrongful termination against CC & P in federal district court. Jurisdiction was based on 28 U.S.C. § 1332(a)(1) (1976), the diversity provision. At the time the suit was filed, Eastman was a citizen of Penn-

sylvania, CC & P was a Delaware corporation with its principal place of business in Waterloo, Iowa, and the amount in controversy was over $10,000.[2] CC & P's attempt to have the case dismissed on summary judgment was unsuccessful, and the matter went to trial. At the close of Eastman's evidence, and again at the close of all the evidence, CC & P moved for a directed verdict. The court reserved ruling on these motions and sent the case to the jury, which promptly returned a verdict for Eastman. The jury awarded Eastman $41,750 in damages—slightly more than the amount Eastman's counsel requested in his closing argument—and the court entered judgment on the verdict. A few days later, CC & P filed a post-trial motion requesting JNOV or, in the alternative, a new trial. *See* Fed.R.Civ.P. 50. After receiving Eastman's response, the court granted CC & P's JNOV motion, vacated the prior judgment, and entered judgment in favor of CC & P and against Eastman. Eastman filed a timely appeal.

## II

Under Illinois law concerning JNOV, which governs in this diversity action, *see Schultz v. American Airlines*, 901 F.2d 621, 623 (7th Cir.1990) (citing *Cincinnati Insurance Co. v. Taylorville*, 818 F.2d 1345, 1348 (7th Cir.1987)), a trial court can override the jury's verdict only when "all of the evidence, when viewed in its aspect most favorable to the opponent [to the JNOV motion], so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern Railroad Co.*, 37 Ill.2d 494, 510, 229 N.E.2d 504, 513–14 (1967). The district court applied the *Pedrick* standard and concluded that "the verdict on behalf of the plaintiff cannot stand." We review that decision *de novo* and apply for ourselves the *Pedrick* standard to the record evidence. *See Commercial Credit Equipment Corp. v. Stamps*, 920 F.2d 1361, 1365 (7th Cir.1990); *David Copperfield's Disappearing, Inc. v. Had-*

---

**2.** At the time Eastman's suit was filed, the amount in controversy requirement in 28 U.S.C. § 1332(a) was $10,000. It has since been in-

creased to $50,000, *see* 28 U.S.C. § 1332(a) (1988), but that amendment applies only to actions commenced on or after May 18, 1989.

*don Advertising Agency, Inc.*, 897 F.2d 288, 291 (7th Cir.1990).

■ In Illinois, unwritten employment arrangements are presumed to be "at-will." In order to overcome this presumption and prove that CC & P made a binding oral contract for permanent employment, Eastman was required to prove that CC & P made "clear and definite" oral promises as to the terms and duration of his employment. *See Wilder v. Butler Mfg. Co.*, 178 Ill.App.3d 819, 128 Ill.Dec. 41, 42, 533 N.E.2d 1129, 1130 (1989) (citing *Titchener v. Avery Coonley School*, 39 Ill.App.3d 871, 350 N.E.2d 502 (1976)). *See also Hindley v. Seltel, Inc.*, 672 F.Supp. 1093, 1095 (N.D.Ill.1987).[3] Mere assurances, expressions of good will, and statements of good intention will not suffice. *See Smith*, 708 F.2d at 264 n. 4. The court in *Wilder* summarized some of the Illinois caselaw on this point as follows:

> In *Titchener*, ... the plaintiff claimed a contract for permanent employment based on assurances in her interview that "your future is here" at the defendant school and the employer "hoped it would be for many years to come." The appellate court found that such "statements which are of an informal character which express only long continuing goodwill and hope for eternal association do not amount to contractual obligations." ... The *Titchener* court consequently [found] such statements were too indefinite to create a certain promise for an oral contract of permanent employment. Similarly, in *Heuvelman v. Triplett Elec. Instr. Co.*, 23 Ill.App.2d 231, 161 N.E.2d 875 (1959), the plaintiff was told by his employer that his job as a salesman was a permanent position. The *Heuvelman* court found that there was no definite and certain terms [sic] which could give rise to a contract for permanent employment....

128 Ill.Dec. at 43, 533 N.E.2d at 1131 (citations omitted). In *Wilder* itself, the court found that the alleged oral promises of permanent employment were not sufficient-ly clear and definite even though those promises included: "we are talking job security," "it's a permanent position," and, "there's no problem, you have a permanent job." *Id.* at 42–43, 533 N.E.2d at 1130–31. Illinois courts also have looked disfavorably on permanent employment contract claims when the plaintiff failed to recall the precise language allegedly used by the employer. *See Koch v. Illinois Power Co.*, 175 Ill.App.3d 248, 124 Ill.Dec. 461, 464, 529 N.E.2d 281, 284 (1988), *appeal denied*, 124 Ill.2d 555, 129 Ill.Dec. 150, 535 N.E.2d 915 (1989) (Table).

■ The record evidence in this case, even when viewed in its aspect most favorable to Eastman, falls well short of the mark set by these Illinois authorities. All Eastman has offered to meet the "clear and definite" standard is his own testimony. That testimony, and the inferences that can be drawn from it, establish, at most, that Hearst reassured Eastman that he would have *a* job at CC & P, not *a job for life* (or any other definite term, for that matter). Hearst wanted to sell Eastman on the viability of the new railroad, so, naturally, he tried to quell Eastman's fears with assurances such as "don't worry" and "you will have a job down the road." At no time, however, according to Eastman's own testimony, did Hearst's statements as to the duration of Eastman's employment descend to the kind of specificity that ordinarily attends discussions of contractual terms. Indeed, Eastman could not even swear that the words "permanent," "guaranteed," or "for life" ever were used. *Compare Wilder*, 128 Ill.Dec. at 42–43, 533 N.E.2d at 1130–31; *Heuvelman*, 161 N.E.2d at 877. Further, when pressed, Eastman could not recall the precise words allegedly used by Hearst, another sign that the discussion between them was not the negotiation of binding contractual obligations. *Compare Koch*, 124 Ill.Dec. at 464, 529 N.E.2d at 284.

---

**3.** Oral contracts for permanent employment, like all contracts, also must be supported by sufficient consideration. The consideration requirement is often problematic in this context. *See Smith v. Board of Educ.*, 708 F.2d 258, 263–64 (7th Cir.1983); *Davies v. Martel Laboratory Services, Inc.*, 189 Ill.App.3d 694, 136 Ill.Dec. 951, 545 N.E.2d 475 (1989). Like the district court, however, we need not, and do not, reach this issue here.

## III

Wayne Eastman took a risk when he left his secure, permanent position at the ICG and joined up with a start-up railroad like the CC & P, a risk that was compensated for at least in part by a higher salary, more responsibility, and other perks. In this case, Eastman claimed that CC & P added to the bargain an oral promise that his position was guaranteed and permanent. The only evidence he can offer to support such a promise by CC & P, however, is his own, equivocal testimony. Under Illinois law, that is not enough. Therefore, the district court's entry of JNOV against Eastman and in favor of CC & P is

AFFIRMED.