Helen TRZCINSKI, Plaintiff-Appellee, Cross-Appellant,

v.

AMERICAN CASUALTY CO., Defendant-Appellant, Cross-Appellee.

Nos. 89-3544 and 89-3584.

United States Court of Appeals, Seventh Circuit.

Argued June 7, 1991.

Decided Jan. 8, 1992.

**308**

Alvin R. Becker, Timothy M. Kelly (argued), Beerman, Swerdlove, Woloshin, Barezky & Berkson, Marvin Glassman, Rabens, Formusa & Glassman, Chicago, Ill., for plaintiff-appellee.

James T. Crotty, Zacarias R. Chacon (argued), Scott W. Hoyne, Crotty & Chacon, Chicago, Ill., for defendant-appellant.

Before COFFEY, FLAUM, and MANION, Circuit Judges.

MANION, Circuit Judge.

Helen Trzcinski brought an action against American Casualty Company ("American") for failure to indemnify a fire loss. American Casualty denied liability, asserting affirmative defenses of arson and fraud by the insured. The jury found in

favor of Mrs. Trzcinski and specifically rejected the arson and fraud defenses in answers to special interrogatories. After trial, American moved for judgment notwithstanding the verdict or, alternatively, a new trial, and Mrs. Trzcinski moved for the imposition of pre-judgment interest. The trial court denied the motions by both parties and entered final judgment ordering American to pay Mrs. Trzcinski $54,691 for damage to the building, damage to the contents and living expenses. Both parties appeal.

American Casualty asserts first that Mrs. Trzcinski committed fraud as a matter of law and second that the jury's verdict was contrary to the manifest weight of the evidence. Mrs. Trzcinski maintains that pursuant to the Illinois Interest Act, she is entitled to pre-judgment interest. We affirm the district court's judgment.

## I. Facts

At trial, American presented evidence to support both arson and fraud defenses. Since American has abandoned the arson defense on appeal, we will review only the facts pertaining to American's fraud claim.

At the time of the fire that destroyed her house in Dolton, Illinois on February 25, 1987, Mrs. Trzcinski lived in her home with her daughter and son-in-law, Gail and Steven Anton, and their son, Scott. Prior to the fire, American had issued an insurance policy to Mrs. Trzcinski and Gail Anton that provided coverage for certain risks of loss to Mrs. Trzcinski's house and its contents, and for additional living expenses. Gail had no ownership interest in the house, but the Antons had lived with Mrs. Trzcinski for ten years at the time of the fire and owned some of the house's contents. The policy had liability limits of $84,000 for the building, $59,000 for personal property and $16,800 for additional living expenses. In their proof-of-loss statement, Mrs. Trzcinski and Gail Anton claimed $102,737.03 for the building and its contents and in excess of $17,000 for living expenses. The Antons received $38,223.51 for contents and $16,153.09 for living ex-

penses, but American denied Mrs. Trzcinski's portion of the claims.

In 1969, Mrs. Trzcinski and her two daughters inherited Mr. Trzcinski's 50% interest in Ed–N–Sam's Motors, a car dealership owned by the partnership that Ed Peters had formed with Mrs. Trzcinski's late husband. Shortly thereafter, Mrs. Trzcinski's daughters signed over their interest to their mother. As of 1984, Mrs. Trzcinski's main source of income was the $800 monthly rent she received from Ed–N–Sam's. In addition, every six months she received $320 interest for a loan she made to her son-in-law. Finally, Mrs. Trzcinski received interest payments from two certificates of deposit in face amounts of $15,000 and $14,000. A substantial amount of the evidence at trial focused on the financial condition of Ed–N–Sam's Motors.

In August 1984, Mrs. Trzcinski became aware of financial difficulties at Ed–N–Sam's. She received a letter from the First National Bank advising her that the bank was canceling the floor plan loan it had made to Ed–N–Sam's. Shortly after that, AMC Jeep pulled its franchise from Ed–N–Sam's. Mrs. Trzcinski went to Ed–N–Sam's to find out what was happening with the business, but according to Mrs. Trzcinski, Peters did not want her around. Nevertheless, Mrs. Trzcinski began coming to the business daily and began to figure out to whom Ed–N–Sam's owed money and the amount that was due. Initially, she answered phones, took in money and checked supplies. As the number of employees declined, however, she began to write checks to pay bills and make deposits. Occasionally, a bookkeeper helped with the books since Mrs. Trzcinski never learned to do them.

Ed–N–Sam's financial condition worsened over the years. In 1985, it lost $109,000 and failed to pay its real estate taxes. Mrs. Trzcinski testified that she understood that because the taxes were not paid, First Lien Company had "purchased the taxes" and that if the taxes were not redeemed within a certain time period, First Lien could sell the real property. Mrs. Trzcinski understood that First Lien's interest was

considered a "lien" on the property because Ed–N–Sam's auditor told her so. At approximately the same time, to help the company's cash flow, Mrs. Trzcinski began holding the rent checks she received from Ed–N–Sam's rather than depositing them, which severely reduced her personal income.

Also in 1985, Steel City Bank foreclosed on the collateral for a loan made to Ed–N–Sam's that Mrs. Trzcinski and Peters had personally guaranteed. Steel City Bank took Mrs. Trzcinski's $15,000 certificate of deposit and in 1986 obtained a judgment against Mrs. Trzcinski, Peters and Ed–N–Sam's for approximately $94,743. To pay the judgment, Mrs. Trzcinski, Peters and Ed–N–Sam's borrowed $100,000 from Republic Bank, collateralized in part by Mrs. Trzcinski's other certificate of deposit of $14,000. The loan was later transferred to another bank and was due shortly after the fire in 1987.

In 1981, Ed–N–Sam's had obtained a Small Business Administration ("SBA") loan for $150,000, which Mrs. Trzcinski personally guaranteed at the request of Peters. As of 1987, the balance due on the loan had been reduced to $109,000. Ed–N–Sam's had stopped making payments on the loan in 1985, and the loan remained in default at the time of the fire. In 1986, the SBA sent a letter to Mrs. Trzcinski to notify her that the loan was in default and to demand payment of the entire principal and interest due.

Beginning in 1985 and continuing through 1988, Peters and Mrs. Trzcinski tried to sell Ed–N–Sam's. Although Peters received one acceptable offer, the buyer could not get financing for the purchase. Ed–N–Sam's was located in the steel manufacturing part of town which had suffered from severe down-turns in business. Mrs. Trzcinski testified that both the SBA and First Lien had agreed to forebear taking action while Peters and Mrs. Trzcinski tried to sell Ed–N–Sam's.

In addition to the financial problems that Ed–N–Sam's had created for her, Mrs. Trzcinski acknowledged that she had other financial problems. In March 1986, Mrs.

Trzcinski received a notice that Phoenix Bond Indemnity Company had purchased Mrs. Trzcinski's real estate at a public auction for delinquent real estate taxes of $1,314.72. The County Collector's office had explained to Mrs. Trzcinski that she had until December 1987 to pay Phoenix Bond to redeem her taxes. Mrs. Trzcinski eventually paid the back taxes and redeemed the real estate after a friend repaid a personal loan.

The day of the fire, Ron Ramsey, an insurance adjuster for American, made an inspection of the fire damage with Steven and Gail Anton. Ramsey spoke with the Antons and Mrs. Trzcinski regarding the fire. After his investigation, Ramsey prepared a building repair estimate. Ramsey estimated that repairing the house to its pre-fire condition would cost $21,434.

After the fire, both Mrs. Trzcinski and American had estimates of repair prepared by third parties. Mrs. Trzcinski employed Clayton Nalon, a public insurance adjuster, to prepare her insurance claim under the policy for the building, the contents and additional living expenses. Nalon inspected the building, obtained information from Mrs. Trzcinski and the Antons and prepared a repair estimate of $43,737.03 for the repair of the house. Nalon presented the estimate to Ramsey who did not think that the estimate was accurate. Ramsey then asked Daniel Lipensky from the Nordic Construction Company to prepare an estimate. Lipensky estimated that $26,497 would put the house in pre-fire condition. Mrs. Trzcinski then requested John Babick of Sikora Builders to make an estimate. Mr. Babick reported to Mrs. Trzcinski that approximately $29,978 would put the house in pre-fire condition. At Mrs. Trzcinski's request, however, Mr. Babick prepared a revised estimate in August 1987 to cut down costs, and Sikora Builders eventually performed the repairs for $23,750. Nevertheless, Mrs. Trzcinski used Nalon's $43,-737.03 estimate in her proof-of-loss claim.

Nalon had been a public insurance adjuster since 1975 and worked in the insurance industry since 1960. He had extensive experience in adjusting property dam-

age. He prepared his estimate of damages and repair costs relying on the National Cost Estimator Manual, a publication recognized for local current pricing on specific materials. Nalon denied that the estimate was exaggerated. During his testimony, Nalon presented a tabular comparison of his repair estimates with the Nordic and Sikora estimates. Nalon discussed several reasons for the difference between the estimates. Nalon believed the floors in the living room, dining room and kitchen should have been removed down to the joists, and the damaged joists replaced at least to the main support beams; the subflooring should have been replaced; and all of the oak flooring should have been replaced. By contrast, Nordic Construction and Sikora Builders proposed to cut out the burned sections of the joists and "sister" them together, which Nalon believed was not the most structurally sound solution. Furthermore, Nordic and Sikora proposed to replace only the burned oak, but Nalon testified that the unburned oak had sustained substantial water damage. While Nalon's estimate had included the replacement value of the Italian gold leaf wallpaper in the living room, Nordic's and Sikora's estimates did not. Lipensky noted that Nalon's estimate included the cost of replacing smoke damaged materials while Lipensky's estimate included only the cost of cleaning and refinishing these materials.

Mrs. Trzcinski testified that she relied on Nalon's expertise not only in estimating damages but also in preparing her proof-of-loss statement. Nalon prepared the sworn proof-of-loss statement based on Mrs. Trzcinski's responses to his questions, and he calculated a total loss for the building and contents, including both Mrs. Trzcinski's and the Antons' personal property, at $102,737.02.

At trial, American pointed out that the proof-of-loss statement contained some inaccurate information. Even though Phoenix Bond had purchased the property at a tax sale, Mrs. Trzcinski's proof-of-loss statement listed her as the sole owner of the property and indicated that no one else had an encumbrance on or an interest in the property. Mrs. Trzcinski testified that she did not consider Phoenix Bond as part-owner of her house as a result of the tax sale. While she understood that First Lien's purchase of Ed–N–Sam's taxes created a "lien" because the auditor had used that term, she testified that she did not know that Phoenix Bond had a similar interest in her house. During examination by American, Mrs. Trzcinski explained her understanding of Phoenix Bond's interest as follows:

> I—let me see. I knew that they bought my taxes, but I knew that I had a certain length of time that I could redeem them. And I don't think when I—that I owed the State of Illinois taxes or someone that they—that the property is not mine. I'm sorry if I'm stupid that way.

(Tr. 200) Mrs. Trzcinski testified that she did not intend to deceive or mislead American by failing to tell Nalon about the tax sale. She explained that Nalon never asked her about taxes and that she did not mention Phoenix Bond because of her misunderstanding of Phoenix Bond's interest.

On April 28, 1987, an attorney for American sent a letter to Mrs. Trzcinski stating that American's investigators had determined that someone intentionally set the fire. The letter required Mrs. Trzcinski to appear for an examination under oath and listed documents that she should bring with her. The list of documents included tax returns, bank statements, bills, receipts and lists of personal and business debts. The letter also demanded that Mrs. Trzcinski authorize American to obtain some records not available to Mrs. Trzcinski.

Mrs. Trzcinski provided American with a list of personal and business debts, including amounts due, but American pointed out at trial that the list was incomplete. As personal debts, Mrs. Trzcinski listed Sears, Visa, J.C. Penney's, Mastercard, and the delinquent property tax debt of $1,314.72. At her examination under oath, she testified that the list contained all of her personal debts at the time of the fire, but the list did not include the loan that she personally guaranteed for $109,000 from the SBA. At trial, Mrs. Trzcinski testified that she did not deny her personal liability on the

SBA loan, but when filling out the proof-of-loss, she did not recall that she had signed the personal guaranty or had received the letter from the SBA notifying her that the loan was in default and demanding payment. Furthermore, although she understood that she was personally responsible for paying the loan, she had always assumed it was a business debt. Therefore, she did not include the SBA loan on the list of personal debts that she prepared for the examination under oath. She insisted that she had no intention of deceiving American by leaving the SBA loan off the list.

As business debts, Mrs. Trzcinski initially included only two of Ed–N–Sam's debts. She listed the $100,000 bank loan and the $109,000 SBA loan but omitted the outstanding $68,000 real estate taxes. At the time of the insurance examination under oath, however, Mrs. Trzcinski voluntarily informed the investigators that she had failed to include the $68,000.

Mrs. Trzcinski's testimony revealed her unfamiliarity with business. Mrs. Trzcinski was 24 years old when she married in 1948. Up to that time, she had finished high school, taken some secretarial courses and worked as a secretary. Mrs. Trzcinski's husband died in 1969. Except for a part time job in a dress shop, Mrs. Trzcinski was not employed from 1955 until she went to Ed–N–Sam's in 1984. Mrs. Trzcinski never took courses in economics, finance, marketing, accounting, bookkeeping or other business management courses. Furthermore, she had never run a business and had no business experience prior to her efforts to unravel the problems at Ed–N–Sam's.

Before submitting the case to the jury, the parties stipulated that if the jury found American had wrongfully denied recovery to Mrs. Trzcinski, her damages claim for living expenses would be $1,486.91 and her damages claim for contents would be $23,726.49. After the jury heard the evidence at trial, it returned a general verdict in favor of Mrs. Trzcinski and against American with damages in the amount of $29,478.53 for the loss of the house. Furthermore, it returned special interrogatories consistent with the general verdict finding that Mrs. Trzcinski did not fraudulently misrepresent her interest or the interests of others in her property and that Mrs. Trzcinski did not submit a grossly inflated claim for the loss of the building with the intent to deceive American.[1]

## II. Analysis

American appeals the judgment on two alternative grounds. First, American argues that Mrs. Trzcinski breached the concealment and fraud provision of the insurance policy as a matter of law by concealing the tax sale of her home, concealing her personal liability on the SBA loan and overstating the estimate for the repair of her house. Second, American argues that it was against the manifest weight of the evidence for the jury to find that Mrs. Trzcinski did not breach the concealment and fraud provision of the insurance policy. Mrs. Trzcinski appeals the denial of prejudgment interest and argues that the district court's interpretation of American's insurance policy negates the public policy evidenced by the Illinois Interest Act.

### A. Fraud and Concealment

■ American's defense of fraud and false swearing stemmed from the following

---

1. The jury answered "no" to each of the following interrogatories:

    *Special Interrogatory 1:* Was the fire of February 27, 1987 at 15514 Dobson Street, Dolton, Illinois, intentionally set by the plaintiff, Helen Trzcinski?

    *Special Interrogatory 2:* Did the plaintiff, Helen Trzcinski, intentionally or with reckless disregard for the truth conceal from American Casualty or its agents information concerning her interest in the insured premises, the interests of others in the premises and the existence of liens and encumbrances on the property?

    *Special Interrogatory 3:* Did the plaintiff, Helen Trzcinski, or her public adjuster, in the presentation of her sworn statement in proof of loss to defendant or in her claim details relating to the dwelling submit a grossly inflated claim for the loss to the building with the intent to deceive or defraud the defendant with reckless disregard for the truth or to gain a bargaining advantage over the defendant in the adjustment of the loss?

provision in the insurance policy that American issued to Mrs. Trzcinski:

> Consumer Fraud. We do not provide coverage for an insured who has:
>
> > (a) intentionally concealed or misrepresented any material fact or circumstances; or
> >
> > (b) made false statements or engaged in fraudulent conduct;
>
> relating to this insurance.

Concealment and fraud provisions in insurance policies have been enforced by both Illinois state courts and federal courts, including this court. *See, e.g., Tenore v. American and Foreign Insurance Co.,* 256 F.2d 791, 794 (7th Cir.), *cert. denied,* 358 U.S. 880, 79 S.Ct. 119, 3 L.Ed.2d 110 (1958); *Lykos v. American Home Ins. Co.,* 609 F.2d 314, 315 (7th Cir.1979), *cert. denied,* 444 U.S. 1079, 100 S.Ct. 1030, 62 L.Ed.2d 762 (1980); *Folk v. National Ben Franklin Ins. Co.,* 45 Ill.App.3d 595, 4 Ill.Dec. 104, 359 N.E.2d 1056 (1976). In *Tenore,* the court stated that given such contract provisions, when an insured willfully makes false statements in proofs of loss with intent to deceive the insurer, the insured cannot recover any amount. "If a false statement is knowingly made ... with regard to a material matter, the [insured's] intent to defraud will be inferred" since the law presumes "every man to intend the natural consequences of his acts." *Tenore,* 256 F.2d at 794–795 (citations omitted). Although Mrs. Trzcinski does not dispute the materiality of the misstatements that American relies upon in its appeal, she insists she did not make them with fraudulent intent.

■ American argues that the evidence established fraud and false swearing as a matter of law, thereby removing the question from the jury. In effect, American is arguing that the district court erred in denying American's motion for judgment notwithstanding the verdict. In diversity cases, state law governs the standard for the entry of judgments notwithstanding the verdict. *A. Kush & Associates, Ltd. v. American States Ins. Co.,* 927 F.2d 929, 942 (7th Cir.1991). Under Illinois law, the trial court should not take a case away from the jury unless "all the evidence, when viewed most favorably to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.,* 37 Ill.2d 494, 229 N.E.2d 504, 514 (1967). We review the district court's denial *de novo* and apply for ourselves the *Pedrick* standard to the evidence on the record. *Eastman v. Chicago, Cent. & Pacific R.R. Co.,* 930 F.2d 1173, 1176 (7th Cir.1991).

■ Ordinarily, the defense of fraud and false swearing presents a question of fact for the jury, but it becomes a question of law when the insured's misrepresentations cannot be seen as innocent. *Lykos,* 609 F.2d at 315 (citing *Folk,* 4 Ill.Dec. at 105, 359 N.E.2d at 1057). Intent to deceive must be present to find fraud. This intent can be inferred when "a person makes a statement knowing it to be false where the statement was made for the purpose of inducing one to whom the statement is made to act." *Szajna v. General Motors Corp.,* 115 Ill.2d 294, 104 Ill.Dec. 898, 910–11, 503 N.E.2d 760, 772–773 (1986). In cases where courts have found fraud as a matter of law, however, they have not automatically inferred fraudulent intent merely because an insured made a statement that is later shown to be false. Illinois courts have observed that intent to defraud should not be presumed and that the trier of fact " 'should make all reasonable allowance for lack of knowledge or sound judgment or for honest mistake on the part of the insured as well as for the tendency to believe that which is to one's own interest.' " *Nagel–Taylor Automotive Supplies, Inc. v. Aetna Casualty & Sur. Co.,* 81 Ill.App.3d 607, 37 Ill.Dec. 412, 415, 402 N.E.2d 302, 305 (1980) (quoting *Harold J. Warren Co. v. Federal Mut. Ins. Co.,* 386 F.2d 579, 581 (1st Cir.1967)). Accordingly, courts have inferred fraudulent intent as a matter of law only where viewing the evidence in the light most favorable to the insured, the court determines that any reasonable jury would find that the insured knowingly made false statements

or willfully sought to defraud the insurer by misrepresentation.

In *Lykos,* this court affirmed a district court's grant of judgment notwithstanding the verdict where uncontradicted evidence showed that the insured knowingly and grossly overvalued the contents of a building that was damaged by fire. In estimating the value of the building's contents, the insured did not refer to records recovered from the fire that would have provided information on the value of the building's contents; did not consult merchants, wholesalers or other suppliers concerning purchases made before the fire to determine the value of the merchandise destroyed; appreciably inflated quantities of merchandise; and duplicated numerous items between the building and contents claims. The insureds did not attempt to justify the overvaluations but attempted to dismiss them as mere estimates for purposes of negotiation. The court held that an attempt to gain advantage in negotiation is sufficient to establish the requisite intent to defraud. *Lykos,* 609 F.2d at 315–16.

Similarly, in *Tenore* an insured submitted a proof-of-loss statement claiming $78,000 for a destroyed gun collection. The undisputed evidence at trial showed that many of the guns in the collection were old and were missing parts, and the insured's own expert testified that the collection was worth no more than $20,000. Nevertheless, the insured valued each gun by using the catalog wholesale value of a new gun. The court found fraud as a matter of law. *Tenore,* 256 F.2d at 795.

In *Folk,* the insured's testimony revealed that after a fire destroyed his restaurant, the insured sold some of his equipment but three months later included the equipment on his proof-of-loss. The insured had never made an attempt to correct his claim to reflect money he had received for the items even after questioning about the sale at his examination under oath. Instead, the insured claimed at the examination that he threw away some of the equipment because it was a total loss. The court found the evidence of false swearing and fraud so clear that it constituted fraud as a matter

of law. *Folk,* 4 Ill.Dec. at 106, 359 N.E.2d at 1058.

Unlike the evidence in *Lykos, Tenore,* and *Folk,* the evidence in this case does not warrant removing the question of fraud and false swearing from the jury. Viewed in the light most favorable to Mrs. Trzcinski, the evidence does not dictate an inference of fraudulent intent. First, Mrs. Trzcinski produced evidence tending to negate an inference that she fraudulently concealed her personal liability on the SBA loan. She disclosed the full amount of the SBA loan as a business debt on the list of debts she provided at her examination under oath. Mrs. Trzcinski's testimony indicated that at the time she signed the papers for the loan in 1981, she was unfamiliar with business and it is plausible that she did not understand her personal liability. Although the letter from the SBA demanded that she make immediate payment of the balance, Mrs. Trzcinski stated that she did not remember receiving the letter and that Peters dealt with the SBA. Mrs. Trzcinski further explained that she always looked upon the debt as a business debt and thought that once she had listed it as a business debt, she did not need to list it again as a personal debt. This testimony coupled with Mrs. Trzcinski's lack of business experience persuades us that the existence of fraudulent intent remained a viable question of fact that the district court properly left to the jury.

Second, Mrs. Trzcinski's testimony suggested that she did not intend to deceive American by concealing the tax sale of her house and the lien it created. In response to American's request for a list of debts and all documents related to the existence, ownership or use of her property, Mrs. Trzcinski listed the real estate taxes she owed but did not provide American with a copy of the notice from Phoenix Bond Company that the real estate had been sold for delinquent taxes. On her proof-of-loss statement, Mrs. Trzcinski listed herself as sole owner and indicated that no one else had an interest in or an encumbrance on the property. In addition, Mrs. Trzcinski stated at her examination under oath that there were no liens on the property. Mrs.

Trzcinski admitted that she understood that First Lien had acquired a lien on the Ed–N–Sam's property because the company auditor had described the interest First Lien acquired when it paid the delinquent taxes as a "lien." On the other hand, she had never been told that Phoenix Bond's interest in her home constituted a lien and the notice from Phoenix Bond did not mention the word "lien." Mrs. Trzcinski testified that she understood only that someone had "bought her taxes" and that she had a certain time to redeem them, but she thought the property was still hers since she still had the deed and no one had taken possession of the property from her. According to Mrs. Trzcinski, when Nalon assisted her with her proof-of-loss statement, he did not ask her about taxes and she did not mention the tax sale since she did not understand that it gave anyone an interest in her property. Based on the record, we cannot agree with American that the district court should have taken the question of fraud away from the jury. While American exposed Mrs. Trzcinski's ignorance of the legal effect of a tax sale, it did not foreclose the possibility that her omissions were innocent.

Third, the estimate for the building repairs was not fraudulently excessive. Mrs. Trzcinski explained that she relied on Nalon's expertise. Nalon explained that his job as a public insurance adjuster was to estimate the value of the property in its pre-fire condition to determine the loss that the insureds are entitled to have compensated. This is not necessarily the same as the cost of the repairs that the insureds may decide to undertake to remedy the problem. Nalon not only explained how he arrived at his estimate but also explained some of the difference between his estimate and those of Sikora and Nordic. While Nalon's estimate exceeded those of Sikora, Nordic and Ramsey, Nalon sufficiently justified his calculations so that we cannot say he fraudulently misrepresented the true value of Mrs. Trzcinski's loss as a matter of law. Nalon's conduct differs substantially from that of the insured in *Lykos*, for example, who claimed losses for property left intact after the fire and also failed to consult his records or the wholesalers and suppliers from whom he purchased merchandise to determine the value of the property that the fire did destroy. *Lykos*, 609 F.2d at 316. Furthermore, unlike the insured in *Lykos*, Nalon and Mrs. Trzcinski have not admitted that they overvalued property and then attempted to justify their exaggerations as mere estimates for purposes of negotiation.

After our *de novo* review of the evidence on the record, we cannot conclude as a matter of law that Mrs. Trzcinski intentionally concealed or misrepresented any material fact or circumstance, made false statements or engaged in fraudulent conduct relating to her insurance. We acknowledge that there is ample evidence from which the fact finder could infer fraudulent intent, but that is not the issue that we must decide before directing the district court to enter judgment notwithstanding the verdict. The evidence does not foreclose a reasonable jury from finding that Mrs. Trzcinski acted with an innocent intent, and we are therefore bound to treat the question of fraudulent intent as a question of fact and accept the jury's determination.

American argues that even if Mrs. Trzcinski did not engage in fraud as a matter of law, the jury's finding that there was no fraud was contrary to the manifest weight of the evidence. In effect, American is arguing that the district court erred in not granting its motion for a new trial. Even in a diversity case, our review of the district court's denial of a motion for a new trial is governed by federal law. *M.T. Bonk Co. v. Milton Bradley Co.*, 945 F.2d 1404, 1407 (7th Cir.1991) (citing *Wassell v. Adams*, 865 F.2d 849, 854 (7th Cir.1989). A district court may grant a new trial "only where the verdict is against the clear weight of the evidence, and we will reverse the district judge's decision only where there is a clear abuse of discretion." *M.T. Bonk Co.*, 945 F.2d at 1407. We will not set aside a jury verdict if a reasonable basis exists in the record to support the verdict. *Id.*

**316**

Under this standard, we cannot say that the judge abused his discretion in denying the motion for a new trial. As the discussion above reveals, there is a reasonable basis in the record to support the jury verdict. The determination of the question of fraud in this case depended in large part on credibility determinations which are uniquely within the province of the jury, and neither we nor the district court are bound to resolve them. *E.g., Lippo v. Mobil Oil Corp.*, 776 F.2d 706, 716 (7th Cir. 1985).

*B. Pre–Judgment Interest*

■ Mrs. Trzcinski has cross-appealed charging that the district court erred in denying her motion for pre-judgment interest under the Illinois Interest Act. The district court based its determination on its reading of the Illinois Interest Act and the insurance contract between Mrs. Trzcinski and American. The district court's interpretation is a question of law that we will review *de novo. See Insurance Corp. of Ireland v. Board of Trustees of Southern Illinois Univ.*, 937 F.2d 331, 336 (7th Cir. 1991) (interpretation of insurance policy guided by Illinois law was a question of law to be reviewed *de novo* ). Under our reading of the Illinois Interest Act and the insurance contract that Mrs. Trzcinski signed with American, Mrs. Trzcinski is not entitled to pre-judgment interest.

Under the Illinois Interest Act, "[c]reditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any ... instrument of writing...." Ill.Rev.Stat., ch. 17, par. 6402.[2] A policy of insurance is an "instrument of writing" within the meaning of the Illinois Interest Act. *Ervin v. Sears, Roebuck & Co.*, 127 Ill.App.3d 982, 82 Ill.Dec. 709, 716, 469 N.E.2d 243, 250 (1984). The dispute in this case, however, is whether the money had "become

due" before the district court entered judgment.

■ American included a provision in the policy it issued to Mrs. Trzcinski and Gail Anton that effectively suspended the due date for payment until after final judgment was entered in a case where liability was disputed.

Loss Payment. We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Loss will be payable 60 days after we receive your proof-of-loss and:

a. we reach an agreement with you;
b. there is an entry of final judgment; or
c. there is a filing of an appraisal award with us.

Insurance policies are contracts and unless a particular term of a policy is ambiguous, the court must construe the policy as written. *Rockford Mut. Ins. Co. v. Schuppner*, 182 Ill.App.3d 898, 131 Ill.Dec. 357, 360, 538 N.E.2d 732, 735 (1989), *appeal denied*, 127 Ill.2d 641, 136 Ill.Dec. 606, 545 N.E.2d 130 (1989). Moreover, the Illinois Court of Appeals has stated that the date from which pre-judgment interest begins to run depends on the terms of the policy and the circumstances of the particular case. *Schulz & Burch Biscuit v. American Protection Ins.*, 96 Ill.App.3d 350, 51 Ill.Dec. 823, 825, 421 N.E.2d 331, 333 (1981). Therefore, we rely on the insurance contract to reach our conclusion.

We agree with the district court that the provision in the insurance policy provides that no money was "due" to Mrs. Trzcinski until judgment was entered. Mrs. Trzcinski asserts that if we enforce the provision interpreted in that way, we allow American to circumvent payment of pre-judgment interest in every case. According to Mrs. Trzcinski, this negates the public policy

---

**2.** Paragraph 6402 provides as follows:

Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing; on money lent or advanced for the use of another; on money due on the settlement of account from the day of liquidating accounts between the parties and ascertaining the balance [ ] on money received to the use of another and retained without the owner's knowledge; and on money withheld by an unreasonable and vexatious delay of payment.

evidenced by the Illinois Interest Act in favor of pre-judgment interest. We are not inclined to declare the genesis of a broad public policy from the specific language of the Illinois Interest Act. Mrs. Trzcinski has not provided us with any authority that Illinois mandates pre-judgment interest and prohibits parties from entering contracts that preclude it. Consequently, we will not disturb the agreement that Mrs. Trzcinski entered into with American.

### III. Conclusion

For the foregoing reasons, the judgment of the district court is

AFFIRMED.