**EUROPLAST, LIMITED,**
Plaintiff–Appellee,

v.

**OAK SWITCH SYSTEMS, INCORPORATED, Defendant–Appellant.**

**No. 92–3571.**

United States Court of Appeals, Seventh Circuit.

Argued May 11, 1993.

Decided Nov. 23, 1993.

Paul W. Grauer (argued), Grauer & Associates, Schaumburg, IL, for Europlast, Ltd.

William I. Caldwell, Jr., Caldwell, Berner & Caldwell, Woodstock, IL, Mark I. Levy, Timothy S. Bishop (argued), Mayer, Brown & Platt, Chicago, IL, for Oak Switch Systems, Inc.

Before CUMMINGS, COFFEY, and MANION, Circuit Judges.

COFFEY, Circuit Judge.

Appellant Oak Switch Systems appeals the district court's refusal to grant a JNOV or new trial after a jury awarded compensatory and punitive damages on plaintiff's contract and tort claims. We affirm the remitted compensatory damage award but reverse the granting of punitive damages.

## I.  BACKGROUND

The defendant-appellant, Oak Switch Systems, Inc. ("Oak"), produces and sells computer keyboards and electric switches. Oak's products are made by injecting plastic into steel molds under high pressure and temperature. Oak owns the steel molds for its plastic parts, but contracts with other companies to inject the plastic into the molds. Oak then assembles the plastic parts into computer keyboards and electric switches.

Oak originally used several manufacturers, including plaintiff-appellee, Europlast, Limited ("EPL"), to produce plastic parts. How-

ever, Oak became dissatisfied both with the quality of the plastic parts it was receiving and with the maintenance of its molds. In 1987, Oak decided to consolidate all its business with EPL. The consolidation project took about a year and involved transferring over three hundred molds to EPL.

Early in 1987, Oak made known to EPL that it might be interested in purchasing EPL if the consolidation venture proved successful. The buy-out idea was not actively pursued until early 1988 when Oak requested financial information about EPL and scheduled a meeting for February 23, 1988 to examine EPL's books, finances and operations. EPL's co-owner, Harold Zacharias, faxed Oak its "financials" prior to the February 23 meeting. In preparation for the meeting, Oak also obtained a Dunn & Bradstreet financial report on EPL that revealed a tax lien against Apex Mold & Die, another company owned by the same individuals who own EPL and also housed in the same building. Additionally, the report reflected that EPL took an average of fifty days to pay its bills. After reviewing the financial data received prior to the February 23 meeting, Robert Bergslien, Oak's company controller informed Oak President James Septer that "there's not much there."

At the February 23 meeting, Bergslien questioned EPL's bookkeeper and obtained additional financial data on EPL. Bergslien prepared a report for Oak's principals dealing with EPL's financial problems based on the information he had collected. The report concluded that EPL's net profit margin was low, a mere 4.5 percent, and that its total liabilities were double its total assets.

At some point, and this is the source of contention between the parties, Oak abandoned its interest in purchasing EPL and began to consider the possibility of creating its own plastic molding plant. Oak requested that Lewis Butler, EPL's national sales manager, generate some figures outlining the start-up costs involved in beginning a plastic molding business. Although Butler was not paid for his services, Oak indicated to Butler that he would "head up" the new Oak plastics division. Butler submitted his report, generated on EPL's computer, to the president of Oak, James Septer, during a golf outing in Florida. Shortly thereafter, Oak abandoned its idea of starting a plastics molding division, concluding that high start-up costs made it infeasible. In late May 1988, at a golf outing in Wisconsin, Septer advised Butler that Oak intended to withdraw its work from EPL. Septer testified that it was his understanding that Butler would not notify EPL of Oak's decision, and, in fact, Butler never did communicate this information to EPL's owners.

On June 9, 1988, Oak terminated EPL as its plastic parts supplier and removed all of its molds from EPL's factory without prior notice. Thereafter, Oak explained in a letter to EPL that its reason for terminating EPL was that it had found a more acceptable acquisition candidate. However, at trial Septer testified that Oak's real concern was that EPL was in a precarious financial situation and could go out of business at any time, potentially leaving Oak in the untenable position of possibly not being able to retrieve its molds. Septer stated at trial that his fear was based upon Butler's repeated warnings of EPL's poor financial condition which placed Oak's molds in jeopardy. Butler denied ever warning Septer about EPL's financial condition.

EPL sued Oak in federal district court under diversity jurisdiction claiming that Oak breached the parties' contract, tortiously interfered with EPL's employment contract with Lewis Butler, and fraudulently misrepresented its intentions to buy out EPL. A jury found in favor of EPL on all counts awarding $200,000 in compensatory damages as well as $300,000 in punitive damages. After trial, Oak moved for JNOV, a new trial, and a remittitur. The trial court denied the motions for JNOV and a new trial, but granted a remittitur reducing the compensatory damages to $162,000 and punitive damages to $75,000.

## II. DISCUSSION

On appeal, the defendant asks us to determine whether the trial court's denial of its motions for JNOV and/or a new trial was proper. We must also evaluate whether the

jury's award of punitive damages was appropriate in this case and whether the record supports a finding of $162,000 in compensatory damages.

### A. Standard of Review

In this diversity case, we apply the forum state's standard of review for granting a JNOV motion. *Pennsylvania Truck Lines, Inc. v. Solar Equity Corp.*, 882 F.2d 221, 225 (7th Cir.1989). Under Illinois law, JNOV is proper when "all of the evidence, when viewed in its aspect most favorable to opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & E. R.R. Co.*, 37 Ill.2d 494, 229 N.E.2d 504, 513 (1967) *accord Trzcinski v. American Cas. Co.*, 953 F.2d 307 (7th Cir.1992). We review *de novo* the lower court's application of *Pedrick. Fleming v. County of Kane*, 898 F.2d 553, 559 (7th Cir.1990). The defendant faces a very heavy burden on appeal because JNOVs and directed verdicts are proper when there is but a mere scintilla of evidence that supports the non-movant's allegations, or when there is some evidence supporting the non-movant's claim which loses its significance when viewed in light of all the evidence. *Pennsylvania Truck Lines*, 882 F.2d at 225. "It is also settled that the court must resolve conflicts in evidence in favor of the plaintiff, and if it finds any evidence, which if believed, could support a verdict for plaintiff, it is error to direct a verdict for a defendant." *Hicks v. Hendricks*, 33 Ill.App.3d 486, 342 N.E.2d 144 (1975).

Our review of the district court's denial of Oak's motions for the granting of a new trial is governed by federal law. *Trzcinski*, 953 F.2d at 315. "A district court may grant a new trial 'only where the verdict is against the clear weight of the evidence, and we will reverse the district judge's decision only where there is a clear abuse of discre-

tion. We will not set aside a jury verdict if a reasonable basis exists in the record to support the verdict." *Id.* (quoting *M.T. Bonk Co. v. Milton Bradley Co.*, 945 F.2d 1404, 1407 (7th Cir.1991)).

### B. Breach of Contract Claim

EPL argues that Oak's failure to timely renew its directed verdict motion on the contract claim at the conclusion of the testimony precludes subsequent review of the district court's refusal to grant JNOV. It is obvious that the trial court determined that Oak preserved its challenge to the contract claim because the court addressed the merits of the defendant's JNOV motion on that claim. Likewise, based on the record, we are of the opinion that Oak preserved its JNOV motion on the contract claim.[1]

Oak argues that its termination of EPL as its sole plastic parts supplier complied with the terms of their contract. In support of this contention Oak relies on a provision in the standardized purchase orders supplied by Oak from which the parties conducted business. The provision reads:

"DEFAULTS—BANKRUPTCY—CANCELLATION. Buyer may cancel this order in whole or in part by written or telegraphic notice (a) if the Seller shall become insolvent or make a general assignment for the benefit of creditors, or a receiver or liquidator for a Seller is appointed or applied for, or if Seller admits in writing its inability to pay its debts as they become due."

Oak contends that EPL fails each of the prevailing tests for insolvency and thus Oak justifiably cancelled its contract with EPL. EPL counters that there is nothing in the record to establish that they were insolvent and thus Oak was guilty of breach of contract. The district court ruled that the purchase orders were valid contracts between

---

1. At the end of trial the following exchange took place:

"THE COURT: I take it defendant is going to have renewed motions on the various counts.

MR CALDWELL: As to Counts III and IV, yes. It is my understanding that we've taken care of Counts I and II [contract claim], and I renew my motions on Counts III and IV, your honor."

The district judge, who presided over the trial, saw fit to address the post trial JNOV motion on count II perhaps because of the above exchange demonstrating that count II was already preserved.

EPL and OAK and the question for the jury was whether Oak breached those contracts. Oak's termination of the contractual relationship was not a breach if EPL was insolvent.

Long ago we noted that "insolvency is a term which has been variously defined." *Brusselback, et al. v. Chicago Joint Stock Land Bank,* 85 F.2d 617 (7th Cir.1936). The Third Circuit measures insolvency "both by a balance sheet showing all assets and liabilities and the test of whether one can meet current debts as persons engaged in a trade normally do." *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1014 (3rd Cir.1980). However, the Third Circuit also noted that "[a] determination of solvency requires a factual review of the [parties'] financial condition and the application of complex and sometimes conflicting accounting practices and valuation theories.... [T]he factual finding ... may present difficulties which should be resolved by the trial court." *Id.* at 1014 n. 17.

The Illinois Uniform Commercial Code sets forth three alternative definitions for insolvency: the individual/business has "ceased to pay his debts in the ordinary course of business, cannot pay his debts as they become due, or is insolvent within the meaning of Federal Bankruptcy Law." Ill. Rev.Stat. ch. 26, 1–201(23). Federal Bankruptcy Law provides that an individual or company is insolvent if "the sum of [its] debts is greater than all such entity's property, at a fair valuation." 11 U.S.C. § 101(32)(A).

As an affirmative defense to terminating their relationship with EPL, Oak maintains that EPL was insolvent under each of the various definitions of insolvency. A review of the record reveals conflicting evidence on the issue of insolvency. For instance, there is no evidence in the record that EPL failed to pay its creditors; rather the Dunn & Bradstreet report indicated that their bills were paid on average within fifty days. Nor is there evidence that EPL filed for bankruptcy. James Septer's testimony that Lewis Butler warned of EPL's bankruptcy and complained of failing to receive prompt commissions certainly cannot be considered as being dispositive for Butler denies making these statements to

Septer. For purposes of this appeal, we review the evidence in the light most favorable to EPL, thus we accept Butler's testimony as true. *Green v. Bernstein,* 238 Ill. App.3d 656, 179 Ill.Dec. 668, 671, 606 N.E.2d 500, 503 (1992) ("[i]t is not our position to second guess the jury's determination of the credibility of witnesses, nor the decisions they make from their credibility determinations"). We are well aware that there is evidence in the record that EPL's liabilities exceeded their assets; in fact, EPL's balance sheets reveal that liabilities were greater than their assets. However, there was also testimony that EPL was solvent as evidenced by its paying debts during the regular course of business, maintaining itself as a going concern, and sustaining an increasing profit margin. We believe that the discrepancy in the evidence of insolvency, a term whose definition is known and understood by the average juror, presents the very factual and credibility determinations that are and were properly left in the hands of the jury. Therefore, we elect to heed the prudence of the Third Circuit and conclude that the trier of fact is most qualified to determine the question of insolvency. *Mellon,* 619 F.2d at 1014–1015 n. 17. Deference to the trier of fact regarding insolvency determinations is proper for we must observe the same constraints by which the trial court was bound: "The trial court ... may not resolve issues of credibility or weigh the evidence on a motion for directed verdict, because controverted issues of fact are for the jury to decide." *Pennsylvania Truck Lines,* 882 F.2d at 225. Accordingly, we deny the defendant's motion JNOV.

■ The above reasoning is equally applicable to our review of the trial court's refusal to grant a new trial. Given the conflicting evidence of insolvency, we are unable to conclude that the jury's verdict is against the clear weight of evidence, and that the trial court clearly abused its discretion in refusing to grant a new trial. *Trzcinski v. American Cas. Co.,* 953 F.2d 307, 315 (7th Cir.1992). An appellate court must affirm a jury verdict if there is a reasonable basis in the record to support the verdict. *Id.* We are of the opinion that the conflicting evi-

dence of insolvency, the dispute over witness testimony, and the complexity of accounting procedures and business practices warrant reasonable inferences in support of a jury verdict in favor of EPL on the breach of contract count. *See Littlefield v. McGuffey*, 954 F.2d 1337, 1348 (7th Cir.1992) ("The jury is the trier of fact—charged with determining the credibility of the witnesses, weighing the evidence, and drawing reasonable inferences"). While the evidence against insolvency may not be the most convincing, we are of the opinion that the weighing of that evidence is exclusively the province of the jury who viewed the evidence first-hand as opposed to merely reviewing the cold pages of an appellate record. *See Churchill v. Waters*, 977 F.2d 1114, 1124 (7th Cir.1992), *cert. granted*, —— U.S. ——, 113 S.Ct. 2991, 125 L.Ed.2d 686 (1993).

### C. *Fraudulent Misrepresentation*

Secondly, Oak contends that EPL failed to meet its burden of proof on the fraud claim and therefore a JNOV or alternatively a new trial should be granted. Under Illinois law, the elements of the tort of intentional misrepresentation are: (1) making a false statement of material fact, (2) known or believed to be false by the party making the statement, (3) intent to induce the other party to act, (4) action by the other party in reliance on the truth of the statement, (5) damage to the other party resulting from such reliance. *Soules v. General Motors Corp.*, 79 Ill.2d 282, 37 Ill.Dec. 597, 599, 402 N.E.2d 599, 601 (1980); *General Motors Acceptance Corp. v. Central National Bank*, 773 F.2d 771, 778 (7th Cir.1985). EPL was required to establish each element of fraud at trial by clear and convincing evidence. *West v. Western Cas. & Sur. Co.*, 846 F.2d 387, 393 (7th Cir.1988).

At trial, EPL contended that Oak's alleged interest in purchasing EPL was a sham orchestrated to acquire EPL's financial information to aid Oak in starting its own plastic molding business, or to put Oak in a better position when negotiating with new plastic parts suppliers. EPL claims fraudulent deception occurred (1) when Oak requested EPL's financial data under the guise of being interested in a buy-out, (2) when Oak's president, James Septer, expressed "an extreme interest" in acquiring EPL on February 23 despite knowledge of EPL's financial distress, and (3) when Oak failed to inform EPL that it was no longer an acquisition candidate until June 9, 1988, even though Oak had made its decision not to acquire EPL only a week after the February 23 meeting.

In its brief and at oral argument Oak only addressed the first element (false statement) and the last element (damages) of the misrepresentation claim. We will likewise limit our analysis to those elements. In support of the allegation that Oak made a false representation of material fact in requesting EPL's financials and maintained ongoing deception until June 9, 1993, EPL offered the following evidence: (1) Oak controller Robert Bergslien informed Oak president James Septer *before* the February 23 meeting that "there's not much there" (referring to EPL's poor financial picture); (2) even though Septer had this information, at the February 23 meeting, Septer told EPL president Harold Zacharias Oak was *extremely interested* in acquiring EPL and he would let EPL know something in two or three weeks; (3) one week after the meeting, Oak contacted EPL sales manager Lew Butler about drawing up some figures for starting Oak's own plastics division which Butler would head up; (4) on March 2, 1988, Bergslien drafted a report recommending against acquiring EPL because of its poor financial status; and (5) as evidence of Oak's ongoing deception, Septer lied to EPL in his June 9, 1988 letter explaining the reason for withdrawing all of Oak's molds from EPL. The only evidence suggesting that Oak truly sought EPL's financial data to assess its qualifications as an acquisition candidate is the testimony of James Septer. The jury, in all probability, balanced the testimony of Bergslien (informing Oak President James Septer of EPL's financial woes in advance of the February 23 meeting) with Septer's statement that he was "extremely interested" in acquiring EPL in spite of their problems. The credibility of Septer, taken in conjunction with the above evidence, is sufficient to create a jury question as to whether Oak obtained EPL's financial information under false pretenses and it

is not unreasonable for the jury to have inferred from the above evidence that Oak was guilty of fraudulently misrepresenting its interest in acquiring EPL to induce EPL to divulge its financial data. *See, e.g., Green,* 179 Ill.Dec. at 671, 606 N.E.2d at 503.

■ Having concluded that there is evidence in the record such that a jury could reasonably find for the plaintiff on the first element of misrepresentation (falsity), we now address the element of damages.[2] EPL alleges that it lost Oak's business because Oak improperly obtained knowledge of EPL's financial status which resulted in injury. The plaintiff argues that Oak was able to use EPL's confidential financial information either to start its own plastics molding division or to comparison shop for a less expensive plastic parts supplier. There is no question that EPL lost a sizable customer when Oak withdrew its orders, but there is a question of whether that loss is traceable to Oak's false representation. Oak argues that it was entitled to withdraw its work from EPL regardless of any false representation. While this may be true, we are of the opinion that there is an obvious nexus between the false statement and the damages, namely, Oak president James Septer testified that Oak removed its molds and work because of EPL's financial instability. The knowledge of that instability came from EPL's own financial data which Oak fraudulently obtained under the guise of being interested in acquiring EPL. We are, therefore, convinced that there is clear and convincing evidence in the record of an ongoing deception such that a reasonable jury could find for the plaintiff. Accordingly, we refuse to reverse the district court's ruling denying the motions for JNOV and a new trial.

**D. *Tortious Interference with Contract***

■ Oak also contends the district court erred in denying its motion for JNOV and a new trial on the interference with contract count. Oak argues that EPL failed to demonstrate that Lewis Butler breached his employment contract with EPL, or that EPL suffered harm from any alleged breach. The elements of tortious interference with contract are: (1) the existence of a valid and enforceable contract; (2) defendant's knowledge of the existing contract; (3) defendant's intentional and malicious inducement of the breach; (4) subsequent breach by a third person due to defendant's wrongful conduct; and (5) resulting damage to plaintiff. *Prince v. Zazove,* 959 F.2d 1395, 1397 (7th Cir. 1992).[3] Oak's primary argument is that because Butler's contract lacked a specified duration of time, he is presumed to have an at-will employment contract cancelable at any time by either party. *See Duldulao v. St. Mary of Nazareth Hosp.,* 115 Ill.2d 482, 106 Ill.Dec. 8, 12, 505 N.E.2d 314, 318 (1987). Because Butler was an employee-at-will, Oak argues that it was free to lure him away from EPL. Oak relies on the Restatement (Second) of Torts § 768 (1979), which states:

"(2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will."

Comment i to § 768 adds:

"If [an employee] is free to terminate his contractual relation with the [employer] when he chooses, there is still a subsisting contract relation; but any interference with it that induces its termination is primarily an interference with the future rela-

2. As previously explained, the defendant, Oak, failed to present any argument challenging the remaining elements of misrepresentation before the district court or on appeal, thus we need not address those elements. *See e.g., Hickey v. Chicago Truck Drivers Union,* 980 F.2d 465, 470 (7th Cir.1992) ("[f]ailure to present an argument to the district court waives that argument on appeal").

3. The Restatement (Second) of Torts further explains:

§ 766. Intentional Interference with Performance of Contract by Third Person
One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.
Restatement (Second) of Torts § 766 (1979).

tion between the parties, and the [employer] has no legal assurance of them. As for the future hopes, he has no legal right but only an expectancy; and when the contract is terminated by the choice of the [employee] there is no breach of it. The competitor is therefore free ... to obtain the future benefits for himself by causing the termination."

Oak maintains that because Butler was an at-will employee and was free to terminate his employment with EPL at any time, he was also free to explore employment opportunities with Oak. We do not agree that Oak is excused from liability merely because of Butler's status as an at-will employee. One Illinois appellate court has stated "[r]ecent decisions have held that a cause of action may exist for tortious interference with a contract of employment at-will." *Cashman v. Shinn,* 109 Ill.App.3d 1112, 65 Ill.Dec. 625, 629, 441 N.E.2d 940, 944 (1982) (citing *Kemper v. Worcester,* 106 Ill.App.3d 121, 62 Ill.Dec. 29, 435 N.E.2d 827 (1982) and Restatement (Second) of Torts § 766, comment g (1979)). The Restatement provides:

> "*Contracts Terminable at Will.* A similar situation exists with a contract that by its terms or otherwise, permits the third person to terminate the agreement at will. Until he has so terminated it, the contract is valid and subsisting, and the defendant may not improperly interfere with it. The fact that the contract is terminable at will, however, is to be taken into account in determining the damages that the plaintiff has suffered by reason of its breach.
>
> "One's interest in a contract terminable at will is primarily an interest in future relations between the parties, and he has no legal assurance of them. For this reason, an interference with this interest is closely analogous to interference with prospective contractual relations. (*See* § 766B). If the defendant was a competitor regarding the business involved in the contract, his interference with the contract may be not improper. (*See* § 768, especially Comment i)."

Restatement (Second) of Torts § 766, comment g. The general principle stated in comment g is that a defendant may not interfere with an at-will contract.[4] Section 768, comment i, is an exception to the general rule and permits a competitor to woo an at-will employee away from his employer. The exception only covers a competitor seeking to hire another employer's at-will employee and should not be extended to permit *any* interference with an at-will employee's contract such as inducing that employee to divulge confidential information or to undermine his employer's best interests.

---

**4.** Many courts recognize the general principle that tortious interference with an at-will or terminable at will contract presents a valid cause of action. *See Wells v. Thomas,* 569 F.Supp. 426, 434 n. 7 (E.D.Pa.1983) ("courts of Pennsylvania have held that employers and employees are entitled to be free from meddling by third parties, even where there is no contract and the employment is at-will"); *Juliette Fowler Homes, Inc. v. Welch Assoc., Inc.,* 793 S.W.2d 660, 666 (Tex. 1990) ("The terminable-at-will status of a contract was no defense to an action for tortious interference with its performance. Until a contract is terminated, it is valid and subsisting, and third persons are not free to tortiously interfere with it."); *Eserhut v. Heister,* 52 Wash.App. 515, 762 P.2d 6, 8 (1988) (holding that the defendant may not interfere with a terminable-at-will employment contract); *Zappa v. Seiver,* 706 P.2d 440, 442 (Colo.App.1985) ("[e]ven a contract terminable at will is entitled to some protection from tortious unwarranted interference.... Until terminated, an at-will contract is valid and subsisting, and a stranger to the contract has no right to interfere improperly with it."); *Mansour*

*v. Abrams,* 120 A.D.2d 933, 502 N.Y.S.2d 877, 878 (N.Y.App.Div.1986) ("[i]mproper interference with a contract terminable at will is actionable"); *Stanfield v. National Elec. Contractors Assoc., Inc.,* 588 S.W.2d 199, 202 (Mo.App.1979) ("[t]his court concludes that a contract terminable at will may be the subject of a cause of action for tortious interference when the interference is alleged to have occurred while the contract was in existence.") One court has required a greater showing on the part of the plaintiff when the defendant's interference is with an at-will contract. "[W]hen a contract is *terminable at will*, a plaintiff, in order to present a prima facie case of tortious interference, must allege and prove not only an *intentional* interference that caused the termination of the at-will contract, but also that the defendant employed *'improper methods.'* " *Duggin v. Adams,* 234 Va. 221, 360 S.E.2d 832, 836 (1987) (quoting *Hechler Chevrolet v. General Motors Corp.,* 230 Va. 396, 337 S.E.2d 744 (1985)). The court, in *Duggin,* went on to list several examples of "improper methods" including bribery, fraud, misrepresentation, deceit, and misuse of confidential information. *Id.*

The mere fact that Oak solicited and received Butler's assistance in drawing up figures to establish their own plastics molding division and offered him the opportunity to head up the new division is insufficient to establish tortious interference as that offer would seem to fall under the exception in § 768 comment i. However, the fact that Butler acted without EPL's approval or knowledge (for instance using EPL's computer to generate figures for Oak) and he maintained ongoing communication with Oak, including entertainment (rounds of golf), more than supports the idea that Butler ceased to be concerned with the best interest of his employer, EPL. The most persuasive evidence of Butler's turncoat activity was his failure to notify EPL that Oak was withdrawing all its molds and orders. Butler's failure to inform EPL is evidence that Oak tortiously interfered with Butler's good faith duty to carry out his ethical and contractual obligations which included seeking out and maintaining sales relationships with EPL's clients. His failure to inform EPL that a client, who constituted 60% of its revenues, was withdrawing its molds and business without notice is clear and convincing evidence of a breach of his duties as sales representative. Although there was no formal written contract defining Butler's duties as a sales representative, he obviously owed a duty to EPL to inform them that Oak was withdrawing its account.[5] We have no doubt that his failure to do so was the result of Oak's ongoing interference with Butler's employment contract.

▇▇▇ Having held that Oak improperly induced Butler to breach his contract with EPL we now address the element of injury. EPL claims that Oak's interference with Butler's employment duties caused Butler to become more concerned with Oak's interests than with EPL's. Butler's conduct, EPL alleges, was certainly a factor in Oak cancelling the purchase orders which resulted in EPL losing the anticipated profits from those orders. While this theory of damages may be classified as being somewhat attenuated, it was neither implausible nor unreasonable for the jury to find that Oak interfered with Butler's duties as EPL's sales manager, and, as a result of that interference, conclude that EPL lost Oak as a customer. Because there is a reasonable basis in the record supporting the jury's finding, we affirm the district court judgment and refuse to grant a JNOV or a new trial.

### E. Compensatory Damages

▇▇▇ After trial, the district judge on remittitur reduced the compensatory damages from $200,000 that the jury awarded to $162,000 because the only damages established were lost profits and there was no evidence supporting an award above $162,000.[6] In a diversity action, the court applies the federal standard in reviewing an excessive damage award. *Pincus v. Pabst Brewing Co.*, 893 F.2d 1544, 1554 (7th Cir.1990). In *Pincus*, we reversed the award because it failed to "meet the test for rationality in light of all of the evidence presented." *Id.* at 1556. *See also Matter of Innovative Constr. Systems, Inc.*, 793 F.2d 875, 887 (7th Cir. 1986) (reversing damage award if it is "monstrously excessive" or the "product of passion and prejudice"). Oak argues that even if it is liable for compensatory damages, the award of $162,000 was "virtually without foundation" in the record. *Id.* at 888.

Harold Zacharias, president of EPL, testified that based on roughly $400,000 of cancelled orders and a 42% manufacturing profit (profit before general administrative expenses) that EPL's lost profit was $162,000. Zacharias testified that the 42% figure came

---

**5.** Even though Butler did not have a written contract, the record reveals that he received a salary and commissions to serve as EPL's national sales manager. Under Illinois law, a duty of good faith and fair dealing is implied in every contract. *First National Bank v. Sylvester*, 196 Ill.App.3d 902, 144 Ill.Dec. 24, 30, 554 N.E.2d 1063, 1069 (1990). Thus Butler had a duty to represent EPL's best interests as sales manager.

**6.** The plaintiff accepted the remitted damages rather than requesting a new trial but now asks that it be permitted to appeal the remittitur. Once a plaintiff accepts a remittitur, it is barred from raising the issue on appeal. Therefore, we decline to address plaintiff's appeal. *E.g. Douglass v. Hustler Magazine, Inc.*, 769 F.2d 1128, 1145 (7th Cir.1985), *cert. denied*, 475 U.S. 1094, 106 S.Ct. 1489, 89 L.Ed.2d 892 (1986).

from one month of business (February 1988). EPL's own financial statements, however, reveal a more modest manufacturing profit. In 1986, the company actually lost money and in 1987 the manufacturing profit was 20.9%. Moreover, EPL's business plan projected 1988–89 manufacturing profits at only 30% and for the same time period estimated the industry average for manufacturing profits in the 26.75% range. At the very least, the evidence reveals that EPL's profit margin was on the increase and, in February 1988, profits were as high as 42%.

In contrast to EPL's request for manufacturing profits, Oak maintains that EPL is only entitled to net profits. *Hannigan v. Sears, Roebuck & Co.*, 410 F.2d 285, 293 (7th Cir.) ("Where lost profits are sought as damages, the assessed damages are to be based on net profits, or a reasonable approximation thereof, and not on gross profits. Net profits constitute the difference between gross profits and the expense of operating the business."), *cert. denied*, 396 U.S. 902, 90 S.Ct. 214, 24 L.Ed.2d 178 (1969). On cross-examination, Harold Zacharias testified that EPL had already incurred all the administrative expenses in preparing to manufacture the molded plastic products and therefore it was entitled to manufacturing profit rather than net profit. Oak's counsel not only cross-examined Zacharias extensively on the calculation of lost profits, he also called Oak's own controller, Robert Bergslien, to testify on the topic of lost profits. The jury was obviously entitled to credit the testimony of Zacharias over Bergslien on this issue. Although the jury and the trial judge awarded greater damages than we may have, it is not the function of an appellate court to second-guess the fact-finder. *Tennes v. Massachusetts, Dep't of Revenue*, 944 F.2d 372, 377 (7th Cir.1991) ("we will not reevaluate the credibility of witnesses, nor 'otherwise consider the weight of the evidence'") (quoting *Goldman v. Fadell*, 844 F.2d 1297, 1300 (7th Cir.1988)). Rather, our role is to review the evidence and be convinced that the verdict is reasonably supported by the record. In the case before us, the testimony of Harold Zacharias combined with the documentation of EPL's increasing profitability lends a reasonable basis to uphold the $162,000 damage

award. Therefore, we refuse to grant a new trial on damages.

### F. *Punitive Damages*

We review the district court's submission of punitive damages to the jury *de novo. Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 23 Ill.Dec. 559, 565, 384 N.E.2d 353, 359 (1978) ("[w]hile the measurement of punitive damages is a jury question, the preliminary question of whether the facts of a particular case justify the imposition of punitive damages is properly one of law.") *Id.* A federal court sitting in diversity looks to the law of the state, Illinois, in determining the appropriateness of punitive damages. *See West v. Western Cas. & Sur. Co.*, 846 F.2d 387 (7th Cir.1988). Illinois courts do not favor punitive damages and insist that plaintiffs must establish "not only simple fraud but gross fraud, breach of trust, or 'other extraordinary or exceptional circumstances clearly showing malice or willfulness.'" *AMPAT/Midwest, Inc. v. Illinois Tool Works, Inc.*, 896 F.2d 1035, 1043 (7th Cir.1990) (citation omitted); *Cornell v. Langland*, 109 Ill. App.3d 472, 65 Ill.Dec. 130, 132, 440 N.E.2d 985, 987 (Ill.App.1982) (punitive damages are appropriate when conduct is "intentional, deliberate and outrageous"). The Illinois Supreme Court has noted that "[b]ecause of their penal nature, punitive damages are not favored in the law, and courts must be cautious in seeing that they are not improperly or unwisely awarded." *Deal v. Byford*, 127 Ill.2d 192, 130 Ill.Dec. 200, 205, 537 N.E.2d 267, 272 (1989); *see also Home Sav. & Loan Ass'n of Joliet v. Schneider*, 108 Ill.2d 277, 91 Ill.Dec. 590, 593, 483 N.E.2d 1225, 1228 (1985) ("[w]hile deceit alone cannot support a punitive damage award, such damages may be allowed '... where the fraud is gross, or the case presents other extraordinary or exceptional circumstances clearly showing malice and willfulness'"). In the present case, the plaintiff may be entitled to punitive damages on either of its tort claims. A review of the evidence supporting the fraud and tortious interference claims reveals little if any evidence of "gross," "wanton" or "malicious" conduct on the part of Oak. Because EPL failed to meet the standard enunciated by the

Illinois Supreme Court of "gross fraud" or "outrageous conduct," and because "deceit alone cannot support a punitive damage award," we hold that the award of punitive damages in this case was improper.

## III. CONCLUSION

For the reasons stated above, we AFFIRM the judgment in favor of EPL for $162,000 in compensatory damages but we REVERSE the punitive damage award.

MANION, Circuit Judge, dissenting.

I respectfully dissent. This is the unusual case where the jury's verdict should be reversed. The facts presented in the district court reveal only that Oak Switch engaged in reasonable business behavior, albeit to EPL's detriment. The evidence does not support the claims for fraud, breach of contract, or tortious interference with contract.

During most of the time Oak Switch purchased parts from EPL, no one doubted it was a sound company. In fact, so impressed was Oak Switch with EPL that it began to investigate the possibility of purchasing EPL. Its initial interest in EPL was necessarily genuine; why else would Oak Switch feign interest in purchasing a supplier? The investigation did provide Oak Switch access to EPL's financial records, which EPL volunteered in order to advance the courtship. The financial records gave an inkling that perhaps EPL was not such a sound company. As Oak Switch investigated further, it began to consider the alternative possibility of starting its own company to replace EPL as a supplier. It even consulted with EPL's national sales manager regarding the costs of starting such a company. He generated a report for Oak Switch. In the meantime Oak Switch discovered that EPL was even questionable as a secure supplier to fill the orders that were then pending. With liabilities exceeding assets, EPL was insolvent under the Illinois Commercial Code's definition of insolvency. Oak Switch then canceled its existing purchase orders, invoking a clause in the orders which allowed cancellation in the event of insolvency. Because Oak Switch found another supplier, it never started its own company to replace EPL. As of the date of oral argument, the national sales manager, whom Oak Switch had consulted, continued to work for EPL.

Oak Switch did not commit fraud by representing that it wanted to purchase EPL. There is no evidence that this was a misrepresentation. Oak Switch certainly did not cause EPL to relinquish some business asset based on this representation. It only gained a peek at the financial records which revealed an unfortunate truth—one that EPL evidently had not previously disclosed to Oak Switch—that EPL was in bad financial shape. This revelation came into focus gradually as Oak Switch conducted its investigation. When Oak Switch saw the real financial picture, it stopped saying that it was interested in purchasing the company.

Also, Oak Switch did not breach its contract by canceling its purchase orders when it discovered EPL's poor financial condition. The purchase orders explicitly allowed cancellation if EPL became "insolvent." Oak Switch had negotiated this right in the terms of its relationship with EPL. The jury should not be given to determine the meaning of "insolvent" as it was used in the purchase orders; interpretation of contractual terms is a legal question left to the court. *National Diamond Syndicate, Inc. v. United Parcel Service, Inc.*, 897 F.2d 253, 256 (7th Cir.1990). The term "insolvent" is "a well defined commercial term and legal term of art." *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1013 (3rd Cir. 1980). The Illinois Commercial Code defines "insolvent" by referring to federal bankruptcy law. Under federal bankruptcy law, insolvency occurs when debts exceed assets. 11 U.S.C. § 101(32)(A). It is not disputed that EPL's debts exceeded its assets; it was insolvent. Therefore, Oak Switch was entitled to cancel the purchase orders.

Finally, it is unreasonable to suppose that Oak Switch possibly interfered with EPL's contractual relationship with its national sales manager. All Oak Switch did was make inquiries about the costs of a start-up company. The national sales manager answered these inquiries. The court posits that Oak Switch caused the national sales manager—an at will employee—to breach his duty of good faith to EPL. True, the nation-

al sales manager had a duty of good faith to EPL. But he did not breach that duty by investigating the possibility of starting a competing company. Many successful employees of a company entertain thoughts of starting a competing company. Some even investigate the possibility of doing so; some actually do defect, and go it on their own. Examples large and small dominate the business scene. In this case, all the national sales manager did was investigate the possibility of starting a competing company at the behest of a prospective partner—Oak Switch. He did not breach a duty of good faith by doing so; neither did Oak Switch interfere with his contractual relationship by encouraging him. The court's decision on this issue is too broad, and thrusts many common business practices into the category of tortious interference with contractual relations.

EPL has presented novel theories of fraud, breach of contract and tortious interference with contractual relations. The jury, not schooled in assessing the limitations of these theories, has agreed with EPL. But the jury should never have been left to consider these technical legal questions. As a matter of law, the facts do not support the legal theories. The district court should have entered j.n.o.v. in Oak Switch's favor. Of course, given my disagreement that Oak Switch engaged in any actionable conduct, I concur with the court's decision to reverse the punitive damages award.