**ATHEY PRODUCTS CORPORATION,**
**Plaintiff,**

v.

**HARRIS BANK ROSELLE, Defendant.**

**No. 93 C 4853.**

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 29, 1995.

Quinton F. Seamons, Robert F. Forrer, Thomas J. Magill, Todd A. Rowden, Sara E. Elder, Wilson & McIlvaine, Chicago, IL, for plaintiff.

James M. Breen, James E. Spiotto, Dianne E. Rist, Chapman & Cutler, Chicago, IL, Michael Leonard Gesas, Gesas, Pilati & Gesas, Ltd., Chicago, IL, Thomas Wilson Waters, Kemp, Grzelakowski & Lorenzini, Ltd., Oak Brook, IL, Kenneth A. Michaels, Jr., Kenneth Michaels & Associates, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

A creditor who did not get paid for goods sold by it when the buyer's bank discontinued a line of credit to the buyer sued the bank for fraud. Jurisdiction is based on diversity of citizenship. The bank, Harris Bank Roselle ("Harris" or "the Bank"), has moved for summary judgment against Athey Products Corporation ("Athey"). For the reasons discussed below, the Bank's motion is granted.

The parties, as required, have submitted statements of undisputed facts and supporting evidentiary materials. The undisputed facts (or facts that if disputed are stated in Athey's version) are as follows.

Athey, a Delaware corporation with its principal place of business in Raleigh, North Carolina, manufactures street sweepers and other road maintenance equipment. Harris is an Illinois banking corporation and has its principal place of business in Roselle, Illinois. In March, 1991, Harris extended an $800,000 line of credit to Schuster Equipment Company ("Schuster"), a seller and distributor of road maintenance equipment. The line of credit was evidenced by a note providing for repayment on demand and a security agreement granting Harris a security interest in all of Schuster's accounts receivable, invento-ry, equipment, furniture, fixtures, goods and chattel. The line of credit operated as a revolving loan pursuant to which Harris advanced funds to Schuster based on a lending formula. Under the loan arrangement, Schuster directed its customers to send payments to a lockbox maintained by Harris in Schuster's name. The funds received in the lockbox were collected by the Bank, deposited in a cash collateral account and applied to reduce the outstanding balance on the line of credit.

In a letter dated February 24, 1992, Harris notified Schuster that "due to the continuing decline in the financial health of [Schuster]," Harris would not extend the company's $800,000 line of credit past March 20, 1992, the date the loan was up for renewal. The letter requested Schuster to contact Harris to arrange to pay off the loan. Between February 24, 1992 and March 5, 1992, Schuster submitted purchase orders to Athey for one sweeper for the City of Austin, Minnesota at a price of $79,185.40, one sweeper for the City of Rochester, Minnesota at a price of $79,264.00 and three sweepers for Ramsey County, Minnesota at a price of $273,525.60. Athey approved Schuster's credit for the purchases and manufactured the sweepers for shipment. Athey eventually shipped all the sweepers to Schuster, but Schuster paid only for the sweeper sold to Rochester. Athey says it received this payment only because Rochester insisted on its certificate of origin and Athey would not provide it until it was paid. Athey also refused to ship the remaining sweepers until it was paid for the one sold to Rochester.

### Count I: Fraud

Harris claims that there is no evidence that Schuster ordered the five sweepers from Athey knowing that it would not compensate Athey for them. There is evidence that without the line of credit, Schuster could not pay Athey for the equipment ordered. Schuster used the credit line to fund all its operating expenses in the normal course of business. Schuster typically borrowed the maximum amount of money available under the line of credit, requesting advances on a weekly or bi-weekly basis. Even

so, prior to February 24, 1992, most weeks the amounts from invoices past due were greater than the total amount of money available under the line of credit. In those situations, Schuster was obligated to decide which vendors' invoices to pay and which to defer.

Schuster's final income statement for the fiscal year ending August 31, 1991 showed a loss of $257,000. Schuster experienced operating losses each month from October, 1991 through January, 1992. Athey's experts state that Schuster's profits were insufficient to pay back the Harris loan and as of the end of February or March, 1992, Schuster was insolvent, though Harris disputes this conclusion.

Nevertheless there is no evidence in the record that in early, 1992, Schuster filed for bankruptcy or completely failed to pay its creditors. Schuster's balance sheets for January–April, 1992 indicate that its assets exceeded its liabilities. Athey's expert agreed that these balance sheets implied solvency.

■ The Illinois Uniform Commercial Code provides that a business is insolvent if it has "ceased to pay [its] debts in the ordinary course of business, cannot pay [its] debts as they become due, or is insolvent within the meaning of Federal Bankruptcy Law." *Id.* (quoting Ill.Rev.Stat. Ch. 26, 1–201(23) (recodified as 810 ILCS 5/1–201(23))). Under Federal Bankruptcy Law, if "the sum of [a company's] debts [are] greater than all such entity's property, at a fair valuation," the company is insolvent. *Id.* (quoting 11 U.S.C. § 101(32)(A)). Where there is conflicting evidence on the issue of insolvency, as in this case, the insolvency question is for the jury to decide. *Europlast, Ltd. v. Oak Switch Systems, Inc.,* 10 F.3d 1266, 1271 (7th Cir.1993).[1]

In resolving a summary judgment motion, all inferences are to be drawn in favor of the non-movant. Although the question is close, I will assume for purposes of this analysis that there are sufficient credibility issues and inferences raised by the conflicting record that a trier of fact could decide from the evidence of Schuster's financial condition at the end of February, 1992 (when Harris advised that it would not renew Schuster's loan) and the fact that Schuster had been told that its line of credit was in jeopardy, that at the time Schuster submitted purchase orders to Athey, it knew that it would be unable to pay for the equipment ordered.[2] *See Price v. Highland Community Bank,* 722 F.Supp. 454, 460 (N.D.Ill.1989); *Allstate Fin. Corp. v. Utility Trailer of Illinois, Inc.,* No. 92 C 3477, 1992 WL 396594, *2, 1992 U.S.Dist. Lexis 19640, *5 (N.D.Ill. Dec. 22, 1992).

Harris argues that even if Schuster's purchase orders were deceitful, Athey did not rely on the purchase orders as representations of Schuster's ability or intent to pay for the sweepers in light of the fact that Athey retained the vehicles' certificates of origin until after receiving payment. Ninety-nine percent of the equipment that Athey manufactures is built to a user's specifications so that the equipment sports the color and parts, *e.g.,* certain lights, an air conditioner, requested by that user. Athey's policy of keeping the certificate of origin was explained as follows:

> The dealer (Schuster) makes the sale. The unit is passed from us (Athey) to the dealer and is delivered to the end user, who has a contract or purchase order with the dealer. That unit is delivered, and most governmental entities are not allowed to pay for the piece of equipment until they have clear title. So we hold the

1. The rule enunciated in *Europlast, Limited v. Oak Switch Systems, Incorporated,* which involved a motion for a directed verdict, is applicable here because the standards for deciding whether to grant such a motion and a summary judgment motion "mirror" each other. *Shields Enterprises, Incorporated v. First Chicago Corporation,* 975 F.2d 1290, 1294 (7th Cir.1992).

2. The fact that the Bank extended Schuster's credit line does not dispel the question of whether Schuster's alleged fraud on Athey continued past its submission of the purchase orders since

there is evidence that Schuster knew that its financial condition could prevent it from timely paying its suppliers' invoices even with the line of credit. Specifically, when Schuster did its weekly check run, it was typical that the amounts of invoices past due were greater than the amount of money available to Schuster under the credit line, obligating Schuster to decide which vendors' invoices to pay and which to defer. Moreover, Schuster was aware that the terms of the loan provided for repayment on demand.

certificate of origin. This encumbers the dealer to go to his bank or lending authority to pay us before he gets paid from the end users.

Akkerman Dep. 126. Thus, Athey apparently thought that retaining the certificate of origin would guarantee that it would receive payment from the dealer before the user paid the dealer. (Regarding most states, Athey's belief that the certificates were sufficient protection may have been true. Unfortunately for Athey, that is not true in Minnesota, where the sweepers were sent.) Thus, there is a question of fact as to whether Athey relied on Schuster's purchase orders as representations of Schuster's intent to pay for the equipment ordered.

If Schuster's purchase orders were misrepresentations upon which Athey relied, to prove fraud, Athey's reliance must have been reasonable. Athey argues that it had no reason to believe that it would not be paid by Schuster since it had been paid for each sweeper sold by it to Schuster for five preceding years and had no notice that Schuster was in financial difficulty. Harris disputes this, but resolution of this dispute is also inappropriate on summary judgment.

■■■ Even if Schuster might be found by a trier of fact to have defrauded Athey, Harris argues that it cannot be liable for Schuster's alleged fraud. Under Illinois law, one who knowingly participates in a fraud is guilty of that fraud. *Shacket v. Philko Aviation, Inc.*, 590 F.Supp. 664, 668 (N.D.Ill. 1984). Moreover,

> a person who, by his conduct, contributes to the misapprehension of another as to a material matter, and intentionally fails to correct the misapprehension, is guilty of fraud.

*Tcherepnin v. Franz*, 393 F.Supp. 1197, 1217 (N.D.Ill.1975). In certain circumstances, conduct may be found to be fraudulent following the event giving rise to the misapprehension. *Id.* at 1216–17 (individuals who ex- amined transcript and heard reports of misrepresentations made at earlier meeting were guilty of fraud by failing to correct misstatements).

■■ Schuster and Harris conducted a meeting on March 6, 1992 to discuss Schuster's financial condition. At the meeting, Schuster gave Harris documents showing bookings of five Athey sweepers, one each to Austin and Rochester and three to Ramsey County, which would generate approximately $600,000 in proceeds. Under Harris' arrangement with Schuster, the entire amount paid for the sweepers would be sent to the Bank lockbox, where it would be used to reduce the loan balance. Schuster's contract with Athey gave Schuster 12 percent, or $12,000 per sweeper, of the total amount. In order to pay Athey, Schuster would have to receive new funds under its line of credit with the Bank. Athey argues that it was in Harris' interest to keep Schuster as a going concern so it could receive the proceeds from the sale of the sweepers. *See General Motors Acceptance Corporation v. Central National Bank of Mattoon*, 773 F.2d 771, 780 (7th Cir.1985).

On March 23, 1992, Harris extended the line of credit for sixty days until May 31, 1992 and continued to provide funds to Schuster. Athey delivered the five sweepers but one buyer had paid only one installment by the end of May. Harris again extended Schuster's credit line on May 29, 1992, for one month. Athey's expert opines that there was no commercially reasonable basis for either extension. Athey essentially contends that Harris had reason to know Schuster's financial condition because Schuster periodically submitted financial information to it.[3] Schuster's financials indicate that it suffered losses in 1991 and 1992. At the time of the first extension, Schuster showed a net operating loss for the fiscal year to date of $227,-162. As of the second extension, Schuster's fiscal year to date loss was $386,314. On June 8th, the Bank received the last payment

---

**3.** The parties agree that each month Schuster provided to Harris borrowing base certificates and account receivable agings. Schuster's assistant treasurer, Mr. Potocki, testified that Schuster also sent Harris on a monthly basis income statements, balance sheets, accounts payable ag- ings and backlog reports. Harris asserts that the Bank received income statements and balance sheets on a monthly basis only generally, accounts payable agings once and backlog reports only with projections if at all.

on the sweepers. Ten days later, Harris notified Schuster that it was terminating the line of credit. The Bank demanded full payment on outstanding amounts of credit by the end of June. Harris reduced the balance on the line of credit from $634,040.55 in February, 1992 to $402,586.11 in July, 1992. (According to Athey, the Bank recovered the remaining amounts from accounts receivable by the end of August.) Athey asserts that the only reasonable conclusion is that Harris knowingly extended the line of credit into June solely because the last payment had not been received for the sweepers. As soon as it was received, before Schuster could pay Athey, Harris locked the door, keeping not only the $12,000 per sweeper Schuster was entitled to receive on the sale, but remaining—and much larger—amounts owed Athey.

Harris asserts that it extended the line of credit to allow Schuster time to find alternative financing and that, in fact, Marc Olsen, Schuster's president, requested the extension. Mr. Olsen testified in his deposition that he was under the impression that Schuster's parent company would arrange for substitute financing for Schuster either with Royal Bank of Canada or another lending institution. Joseph Potocki, Schuster's assistant secretary and assistant treasurer, testified that Schuster did not want to end its relationship with Harris but that Schuster's parent engaged Hugh Larratt–Smith of Trimmingham & Company, a financial consulting firm, to seek alternative financing for itself and Schuster. Peter Heuser, the Harris loan officer responsible for the Schuster loan, also testified in his deposition that sometime in early April, 1992, Mr. Larratt–Smith stopped by Mr. Heuser's office on the way to the airport and provided three or four names of alternative financing institutions he had contacted.

Athey disputes that Schuster was looking for or had a reasonable chance of obtaining new financing. Athey cites to Mr. Olsen's deposition testimony that, contrary to Mr. Heuser's assertion, he did not ask the Bank to extend its demand for payment. However, later in Mr. Olsen's deposition, he states only that he does not remember asking for an extension. Athey points out that the only

documentary evidence that Trimmingham was ever associated with Schuster is an engagement letter dated June 1, 1992, which is after the Bank had twice extended the line of credit, and a resignation letter dated June 20, 1992. Mr. Olsen stated that he was not introduced to Mr. Larratt–Smith prior to June, 1992 and did not hear of him in connection with obtaining financing for Schuster. Athey also notes that Harris has not presented documentary evidence regarding Schuster's supposed attempt at refinancing such as memoranda to the file, internal memoranda, meeting notes, financial analyses, or correspondence from or to banking institutions. Finally, Athey's expert states that in light of Schuster's financial state, it was highly unlikely that Schuster could refinance, and it was equally unlikely that the Bank did not know this fact.

Harris nevertheless can be liable for fraud against Athey only if there is sufficient evidence from which a jury could find, by clear and convincing evidence, that when Harris extended the line of credit to Schuster past March 20, 1992, it believed that this was Schuster's only source of funding its operation and would be insufficient to pay Athey for the sweepers. See TMF Tool Co., Inc. v. Siebengartner, 899 F.2d 584, 588 n. 4 (7th Cir.1990) (Under Illinois law, fraud must be proved by clear and convincing evidence).

The parties agree that between March and June 30, 1992, Harris advanced to Schuster $1,641,538. It is not disputed that from March to June, 1992, the loan balance at times exceeded the balance on March 20, 1992 ($533,306.98). For example, after Harris received payment from Austin on May 18, 1992, it made advances to Schuster in the amount of $200,000, increasing the loan balance to $700,668.60 as of May 22, which was $76,001.42 more than the balance of the loan just before the Austin payment was applied and $167,361.62 more than the balance on March 20, 1992. Following its receipt of Ramsey County's first payment on May 29, 1992, Harris made further advances to Schuster, raising the balance of the loan $7,981.64 higher than the balance immediately prior to applying the Ramsey County payment and $127,485.97 higher than the balance

on March 20, 1992. Additionally, upon receiving Ramsey County's second payment on June 9, 1992, the loan was reduced to $394,-650.95. The combination of payments to Harris and advances to Schuster increased the loan to $521,611 on June 22, though by the close of business on that day, the principal balance was $505,830.85.

The fact that Harris permitted the loan balance to rise above the March, 1992 figure and then advanced Schuster money immediately before terminating the loan is completely inconsistent with a theory that Harris weaved a plan solely aimed at decreasing the balance of the loan at the expense of defrauding Athey. Furthermore, the parties agree that Harris did not tell Schuster how it should spend the funds advanced. Although Athey maintains that Schuster's financial condition effectively removed its discretion as to where the funds would be channelled, since Harris continued to lend more money without any strings on Schuster's decisions about which creditors to pay, Harris did not prevent Schuster from paying Athey.

Since the undisputed evidence would preclude a trier of fact from finding clear and convincing evidence that Harris extended credit to Schuster to maintain it temporarily as a going concern in order to reduce the outstanding balance of the loan at the cost of Athey not receiving payment for the sweepers ordered by Schuster, Harris is entitled to summary judgment on Athey's claim for fraud in Count I of the complaint.

### Count IV: Unjust Enrichment

■ For Athey to prevail on its cause of action based on unjust enrichment, it must prove that the Bank "has unjustly retained a benefit to [Athey's] detriment, and that [the Bank's] retention of that benefit violates fundamental principles of justice, equity, and good conscience." *Firemen's Annuity and Benefit Fund of the City of Chicago v. Municipal Employees', Officers', and Officials' Annuity and Benefit Fund of Chicago*, 219 Ill.App.3d 707, 579 N.E.2d 1003, 1007, 162 Ill.Dec. 189, 193 (1st Dist.1991). In support

of this claim, Athey argues that Harris cannot retain those funds because of its fraudulent conduct. Since I have concluded that the evidence shows Harris did not engage in fraud, Athey's argument on this claim fails. Summary judgment will therefore be entered in favor of Harris.

### Count V: Constructive Trust

■ A constructive trust is an equitable remedy, *Conway v. Conners*, 101 Ill. App.3d 121, 427 N.E.2d 1015, 1021, 56 Ill. Dec. 610, 616 (1st Dist.1981), rather than a cause of action. *Pucci v. Litwin*, 828 F.Supp. 1285, 1300 (N.D.Ill.1993). A court may impose a constructive trust based on a finding of fraud. *Suttles v. Vogel*, 126 Ill.2d 186, 533 N.E.2d 901, 904–05, 127 Ill.Dec. 819, 822–23 (1988). Although Athey may not bring a separate cause of action for a constructive trust, it could have requested a constructive trust as a remedy to the fraud alleged in the substantive counts of the complaint. However, because Harris is entitled to summary judgment on these claims, there is no basis on which to impose a constructive trust. Summary judgment on Count V of the complaint will be entered in favor of Harris.

### Count VI: Tortious Interference with a Contract

■ To demonstrate that Harris tortiously interfered with Schuster's contract to pay Athey for the sweepers, Athey is required to show that Harris intentionally and maliciously induced Schuster to breach that contract. *Europlast, Limited v. Oak Switch Systems, Incorporated, supra*, 10 F.3d at 1273. Essentially the same evidence that allows Harris to obtain summary judgment on Athey's fraud claim also requires summary judgment on this claim.[4] The Bank's motion for summary judgment on Count VI of the complaint is granted.

### Count VII: Entitlement to Proceeds of Collateral

■ Pursuant to Section 9–105(h) of the Uniform Commercial Code, 810 ILCS

---

4. Although the standard of proof is a preponderance of the evidence, rather than clear and convincing evidence, there is simply insufficient evidence to go to a jury on this claim for the reasons discussed above.

5/9–105(h), the sweepers are "goods." Under section 9–109(4) of the UCC, 810 ILCS 5/9–109(4), once Athey delivered the sweepers to Schuster, the sweepers became "inventory" because they were held for sale. Athey does not possess the sweepers and has presented no evidence that it entered into a written security agreement with Schuster; therefore, Athey has no security interest in the sweepers. 810 ILCS 5/9–203. Accordingly, Harris is entitled to summary judgment on Count VII of the complaint.

### Conclusion

For the reasons set forth above, the Harris Bank's motion for summary judgment against Athey is granted.